LOCAL 761, INTERNATIONAL UNION OF ELEC-
TRICAL, RADIO & MACHINE WORKERS, AFL–
CIO *v.* NATIONAL LABOR RELATIONS BOARD
ET AL.

No. 321.   Argued April 17–18, 1961.—Decided May 29, 1961.

*Benjamin C. Sigal* argued the cause for petitioner.
With him on the brief were *David S. Davidson, Mozart
G. Ratner* and *Herbert L. Segal.*

*Norton J. Come* argued the cause for the National Labor Relations Board, respondent. With him on the briefs were former *Solicitor General Rankin, Solicitor General Cox, Stuart Rothman* and *Dominick L. Manoli.*

*Gerard D. Reilly* argued the cause and filed a brief for the General Electric Co., respondent.

*David E. Feller* filed a brief for the United Steelworkers of America et al., as *amici curiae,* urging reversal.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

Local 761 of the International Union of Electrical, Radio and Machine Workers, AFL–CIO, was charged with a violation of § 8 (b)(4)(A) of the National Labor Relations Act, as amended by the Taft-Hartley Act, 61 Stat. 136, 141, upon the following facts.

General Electric Corporation operates a plant outside of Louisville, Kentucky, where it manufactures washers, dryers, and other electrical household appliances. The square-shaped, thousand-acre, unfenced plant is known as Appliance Park. A large drainage ditch makes ingress and egress impossible except over five roadways across culverts, designated as gates.

Since 1954, General Electric sought to confine the employees of independent contractors, described hereafter, who work on the premises of the Park, to the use of Gate 3–A and confine its use to them. The undisputed reason for doing so was to insulate General Electric employees from the frequent labor disputes in which the contractors were involved. Gate 3–A is 550 feet away from the nearest entrance available for General Electric employees, suppliers, and deliverymen. Although anyone can pass the gate without challenge,[1] the

---

[1] During the strike in question a guard was stationed at the gate.

roadway leads to a guardhouse where identification must be presented. Vehicle stickers of various shapes and colors enable a guard to check on sight whether a vehicle is authorized to use Gate 3–A. Since January 1958, a prominent sign has been posted at the gate which states: "GATE 3–A FOR EMPLOYEES OF CONTRACTORS ONLY—G. E. EMPLOYEES USE OTHER GATES." On rare occasions, it appears, a General Electric employee was allowed to pass the guardhouse, but such occurrence was in violation of company instructions. There was no proof of any unauthorized attempts to pass the gate during the strike in question.

The independent contractors are utilized for a great variety of tasks on the Appliance Park premises. Some do construction work on new buildings; some install and repair ventilating and heating equipment; some engage in retooling and rearranging operations necessary to the manufacture of new models; others do "general maintenance work." These services are contracted to outside employers either because the company's employees lack the necessary skill or manpower, or because the work can be done more economically by independent contractors. The latter reason determined the contracting of maintenance work for which the Central Maintenance department of the company bid competitively with the contractors. While some of the work done by these contractors had on occasion been previously performed by Central Maintenance, the findings do not disclose the number of employees of independent contractors who were performing these routine maintenance services, as compared with those who were doing specialized work of a capital-improvement nature.

The Union, petitioner here, is the certified bargaining representative for the production and maintenance workers who constitute approximately 7,600 of the 10,500 employees of General Electric at Appliance Park. On

July 27, 1958, the Union called a strike because of 24 unsettled grievances with the company. Picketing occurred at all the gates, including Gate 3–A, and continued until August 9 when an injunction was issued by a Federal District Court. The signs carried by the pickets at all gates read: "LOCAL 761 ON STRIKE G. E. UNFAIR." Because of the picketing, almost all of the employees of independent contractors refused to enter the company premises.

Neither the legality of the strike or of the picketing at any of the gates except 3–A nor the peaceful nature of the picketing is in dispute. The sole claim is that the picketing before the gate exclusively used by employees of independent contractors was conduct proscribed by § 8 (b)(4)(A).

The Trial Examiner recommended that the Board dismiss the complaint. He concluded that the limitations on picketing which the Board had prescribed in so-called "common situs" cases were not applicable to the situation before him, in that the picketing at Gate 3–A represented traditional primary action which necessarily had a secondary effect of inconveniencing those who did business with the struck employer. He reasoned that if a primary employer could limit the area of picketing around his own premises by constructing a separate gate for employees of independent contractors, such a device could also be used to isolate employees of his suppliers and customers, and that such action could not relevantly be distinguished from oral appeals made to secondary employees not to cross a picket line where only a single gate existed.

The Board rejected the Trial Examiner's conclusion, 123 N. L. R. B. 1547. It held that, since only the employees of the independent contractors were allowed to use Gate 3–A, the Union's object in picketing there was

"to enmesh these employees of the neutral employers in its dispute with the Company," thereby constituting a violation of § 8 (b)(4)(A) because the independent employees were encouraged to engage in a concerted refusal to work "with an object of forcing the independent contractors to cease doing business with the Company." [2]

The Court of Appeals for the District of Columbia granted enforcement of the Board's order, 107 U. S. App. D. C. 402, 278 F. 2d 282. Although noting that a fine line was being drawn, it concluded that the Board was correct in finding that the objective of the Gate 3-A picketing was to encourage the independent-contractor employees to engage in a concerted refusal to perform services for their employers in order to bring pressure on General Electric. Since the incidence of the problem involved in this case is extensive and the treatment it has received calls for clarification, we brought the case here, 364 U. S. 869.

## I.

Section 8 (b)(4)(A) of the National Labor Relations Act provides that it shall be an unfair labor practice for a labor organization

> ". . . to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles,

---

[2] Member Fanning concurred in the result, reasoning that the common-situs criteria set out by the Board in *Sailors' Union of the Pacific (Moore Dry Dock)*, 92 N. L. R. B. 547, could be applied to situations where the primary employer owned the premises, and that the requirement that the picketing take place reasonably close to the situs of the labor dispute had therefore been violated by the picketing around Gate 3-A.

materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring . . . any employer or other person . . . to cease doing business with any other person. . . ."

This provision could not be literally construed; otherwise it would ban most strikes historically considered to be lawful, so-called primary activity. "While § 8 (b) (4) does not expressly mention 'primary' or 'secondary' disputes, strikes or boycotts, that section often is referred to in the Act's legislative history as one of the Act's 'secondary boycott sections.'" *Labor Board* v. *Denver Building Council*, 341 U. S. 675, 686. "Congress did not seek, by § 8 (b) (4), to interfere with the ordinary strike . . . ." *Labor Board* v. *International Rice Milling Co.*, 341 U. S. 665, 672. The impact of the section was directed toward what is known as the secondary boycott whose "sanctions bear, not upon the employer who alone is a party to the dispute, but upon some third party who has no concern in it." *International Brotherhood of Electrical Workers* v. *Labor Board*, 181 F. 2d 34, 37. Thus the section "left a striking labor organization free to use persuasion, including picketing, not only on the primary employer and his employees but on numerous others. Among these were secondary employers who were customers or suppliers of the primary employer and persons dealing with them . . . and even employees of secondary employers so long as the labor organization did not . . . 'induce or encourage the employees of any employer to engage in a strike or a concerted refusal in the course of their employment' . . . ." *Labor Board* v. *Local 294, International Brotherhood of Teamsters*, 284 F. 2d 887, 889.

But not all so-called secondary boycotts were outlawed in § 8 (b) (4) (A). "The section does not speak generally of secondary boycotts. It describes and condemns specific union conduct directed to specific objectives. . . .

Employees must be induced; they must be induced to engage in a strike or concerted refusal; an object must be to force or require their employer or another person to cease doing business with a third person.   Thus, much that might argumentatively be found to fall within the broad and somewhat vague concept of secondary boycott is not in terms prohibited."   *Local 1976, United Brotherhood of Carpenters* v. *Labor Board,* 357 U. S. 93, 98.   See also *United Brotherhood of Carpenters (Wadsworth Building Co.),* 81 N. L. R. B. 802, 805.

Important as is the distinction between legitimate "primary activity" and banned "secondary activity," it does not present a glaringly bright line.   The objectives of any picketing include a desire to influence others from withholding from the employer their services or trade. See *Sailors' Union of the Pacific (Moore Dry Dock),* 92 N. L. R. B. 547.   "[I]ntended or not, sought for or not, aimed for or not, employees of neutral employers do take action sympathetic with strikers and do put pressure on their own employers."   *Seafarers International Union* v. *Labor Board,* 265 F. 2d 585, 590.   "It is clear that, when a union pickets an employer with whom it has a dispute, it hopes, even if it does not intend, that all persons will honor the picket line, and that hope encompasses the employees of neutral employers who may in the course of their employment (deliverymen and the like) have to enter the premises."   *Id.,* at 591.   "Almost all picketing, even at the situs of the primary employer and surely at that of the secondary, hopes to achieve the forbidden objective, whatever other motives there may be and however small the chances of success."   *Local 294, supra,* at 890.   But picketing which induces secondary employees to respect a picket line is not the equivalent of picketing which has an object of inducing those employees to engage in concerted conduct against their employer in order to force him to refuse to deal with the struck

employer. *Labor Board* v. *International Rice Milling,
supra.*

However difficult the drawing of lines more nice than
obvious, the statute compels the task. Accordingly, the
Board and the courts have attempted to devise reason-
able criteria drawing heavily upon the means to which a
union resorts in promoting its cause. Although "[n]o
rigid rule which would make . . . [a] few factors conclu-
sive is contained in or deducible from the statute," *Sales
Drivers* v. *Labor Board,* 229 F. 2d 514, 517,[3] "[i]n the
absence of admissions by the union of an illegal intent,
the nature of acts performed shows the intent." *Seafarers·
International Union, supra,* at 591.

The nature of the problem, as revealed by unfolding
variant situations, inevitably involves an evolutionary
process for its rational response, not a quick, definitive
formula as a comprehensive answer. And so, it is not
surprising that the Board has more or less felt *its* way
during the fourteen years in which it has had to apply
§ 8 (b)(4)(A), and has modified and reformed its stand-
ards on the basis of accumulating experience. "One of
the purposes which lead to the creation of such boards is
to have decisions based upon evidential facts under the
particular statute made by experienced officials with an
adequate appreciation of the complexities of the subject
which is entrusted to their administration." *Republic
Aviation Corp.* v. *Labor Board,* 324 U. S. 793, 800.

## II.

The early decisions of the Board following the Taft-
Hartley amendments involved activity which took place
around the secondary employer's premises. For example,
in *Wadsworth Building Co., supra,* the union set up a
picket line around the situs of a builder who had con-

---

[3] See also *Labor Board* v. *General Drivers, Local 968,* 225 F. 2d 205.

tracted to purchase prefabricated houses from the primary employer. The Board found this to be illegal secondary activity. See also *Printing Specialties Union (Sealbright Pacific)*, 82 N. L. R. B. 271. In contrast, when picketing took place around the premises of the primary employer, the Board regarded this as valid primary activity. In *Oil Workers International Union (Pure Oil Co.)*, 84 N. L. R. B. 315, Pure had used Standard's dock and employees for loading its oil onto ships. The companies had contracted that, in case of a strike against Standard, Pure employees would take over the loading of Pure oil. The union struck against Standard and picketed the dock, and Pure employees refused to cross the picket line. The Board held this to be a primary activity, although the union's action induced the Pure employees to engage in a concerted refusal to handle Pure products at the dock. The fact that the picketing was confined to the vicinity of the Standard premises influenced the Board not to find that an object of the activity was to force Pure to cease doing business with Standard, even if such was a secondary effect.

> "A strike, by its very nature, inconveniences those who customarily do business with the struck employer. Moreover, any accompanying picketing of the employer's premises is necessarily designed to induce and encourage third persons to cease doing business with the picketed employer. It does not follow, however, that such picketing is therefore proscribed by Section 8 (b)(4)(A) of the Act." 84 N. L. R. B., at 318.

See also *Newspaper & Mail Deliverers' Union (Interborough News Co.)*, 90 N. L. R. B. 2135; *International Brotherhood of Teamsters (Di Giorgio Wine Co.)*, 87 N. L. R. B. 720; *International Brotherhood of Teamsters (Rice Milling Co.)*, 84 N. L. R. B. 360.

In *United Electrical Workers (Ryan Construction Corp.)*, 85 N. L. R. B. 417, Ryan had contracted to perform construction work on a building adjacent to the Bucyrus plant and inside its fence. A separate gate was cut through the fence for Ryan's employees which no employee of Bucyrus ever used. The Board concluded that the union—on strike against Bucyrus—could picket the Ryan gate, even though an object of the picketing was to enlist the aid of Ryan employees, since Congress did not intend to outlaw primary picketing.

> "When picketing is wholly at the premises of the employer with whom the union is engaged in a labor dispute, it cannot be called 'secondary' even though, as is virtually always the case, an object of the picketing is to dissuade all persons from entering such premises for business reasons. It makes no difference whether 1 or 100 other employees wish to enter the premises. It follows in this case that the picketing of Bucyrus premises, which was primary because in support of a labor dispute *with Bucyrus,* did not lose its character and become 'secondary' at the so-called Ryan gate because Ryan employees were the only persons regularly entering Bucyrus premises at that gate." 85 N. L. R. B., at 418. See also *General Teamsters (Crump, Inc.),* 112 N. L. R. B. 311.

Thus, the Board eliminated picketing which took place around the situs of the primary employer—regardless of the special circumstances involved—from being held invalid secondary activity under § 8 (b)(4)(A).

However, the impact of the new situations made the Board conscious of the complexity of the problem by reason of the protean forms in which it appeared. This became clear in the "common situs" cases—situations where two employers were performing separate tasks on

common premises. The *Moore Dry Dock* case, *supra*, laid out the Board's new standards in this area. There, the union picketed outside an entrance to a dock where a ship, owned by the struck employer, was being trained and outfitted. Although the premises picketed were those of the secondary employer, they constituted the only place where picketing could take place; furthermore, the objectives of the picketing were no more aimed at the employees of the secondary employer—the dock owner—than they had been in the *Pure Oil* and *Ryan* cases. The Board concluded, however, that when the situs of the primary employer was "ambulatory" there must be a balance between the union's right to picket and the interest of the secondary employer in being free from picketing. It set out four standards for picketing in such situations which would be presumptive of valid primary activity: (1) that the picketing be limited to times when the situs of dispute was located on the secondary premises, (2) that the primary employer be engaged in his normal business at the situs, (3) that the picketing take place reasonably close to the situs, and (4) that the picketing clearly disclose that the dispute was only with the primary employer. These tests were widely accepted by reviewing federal courts. See, *e. g., Labor Board* v. *Service Trade Chauffeurs,* 191 F. 2d 65 (C. A. 2d Cir.); *Piezonki* v. *Labor Board,* 219 F. 2d 879 (C. A. 4th Cir.); *Labor Board* v. *Chauffeurs, Teamsters,* 212 F. 2d 216 (C. A. 7th Cir.); *Labor Board* v. *Local 55,* 218 F. 2d 226 (C. A. 10th Cir.). As is too often the way of law or, at least, of adjudications, soon the *Dry Dock* tests were mechanically applied so that a violation of one of the standards was taken to be presumptive of illegal activity. For example, failure of picket signs clearly to designate the employer against whom the strike was directed was held to be violative of § 8 (b)(4)(A). See *Superior Derrick Corp.* v. *Labor Board,* 273 F. 2d 891; *Truck*

*Drivers* v. *Labor Board,* 249 F. 2d 512; *Labor Board* v. *Local 728,* 228 F. 2d 791.[4]

In *Local 55 (PBM),* 108 N. L. R. B. 363, the Board for the first time applied the *Dry Dock* test, although the picketing occurred at premises owned by the primary employer. There, an insurance company owned a tract of land that it was developing, and also served as the general contractor. A neutral subcontractor was also doing work at the site. The union, engaged in a strike against the insurance company, picketed the entire premises, characterizing the entire job as unfair, and the employees of the subcontractor walked off. The Court of Appeals for the Tenth Circuit enforced the Board's order which found the picketing to be illegal on the ground that the picket signs did not measure up to the *Dry Dock* standard that they clearly disclose that the picketing was directed against the struck employer only. 218 F. 2d 226.

The Board's application of the *Dry Dock* standards to picketing at the premises of the struck employer was made more explicit in *Retail Fruit & Vegetable Clerks (Crystal Palace Market),* 116 N. L. R. B. 856. The owner of a large common market operated some of the shops within, and leased out others to independent sellers. The union, although given permission to picket the owner's individual stands, chose to picket outside the entire market. The Board held that this action was violative of § 8 (b) (4) (A) in that the union did not attempt to minimize the effect of its picketing, as required in a common-situs case, on the operations of the neutral employers utilizing the market. "We believe . . . that the foregoing

---

[4] The *Dry Dock* criteria had perhaps their widest application in the trucking industry. There, unions on strike against truckers often staged picketing demonstrations at the places of pickup and delivery. Compare *International Brotherhood of Teamsters (Schultz Refrigerated Service, Inc.),* 87 N. L. R. B. 502, with *International Brotherhood of Teamsters (Sterling Beverages, Inc.),* 90 N. L. R. B. 401.

principles should apply to all common situs picketing, including cases where, as here, the picketed premises are owned by the primary employer." 116 N. L. R. B., at 859. The *Ryan* case, *supra,* was overruled to the extent it implied the contrary. The Court of Appeals for the Ninth Circuit, in enforcing the Board's order, specifically approved its disavowance of an ownership test. 249 F. 2d 591. The Board made clear that its decision did not affect situations where picketing which had effects on neutral third parties who dealt with the employer occurred at premises occupied solely by him. "In such cases, we adhere to the rule established by the Board . . . that more latitude be given to picketing at such separate primary premises than at premises occupied in part (or entirely) by secondary employers." 116 N. L. R. B., at 860, n. 10.

In rejecting the ownership test in situations where two employers were performing work upon a common site, the Board was naturally guided by this Court's opinion in *Rice Milling,* in which we indicated that the location of the picketing at the primary employer's premises was "not necessarily conclusive" of its legality. 341 U. S., at 671. Where the work done by the secondary employees is unrelated to the normal operations of the primary employer, it is difficult to perceive how the pressure of picketing the entire situs is any less on the neutral employer merely because the picketing takes place at property owned by the struck employer. The application of the *Dry Dock* tests to limit the picketing effects to the employees of the employer against whom the dispute is directed carries out the "dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own." *Labor Board* v. *Denver Building Council, supra,* at 692.

## III.

From this necessary survey of the course of the Board's treatment of our problem, the precise nature of the issue before us emerges. With due regard to the relation between the Board's function and the scope of judicial review of its rulings, the question is whether the Board may apply the *Dry Dock* criteria so as to make unlawful picketing at a gate utilized exclusively by employees of independent contractors who work on the struck employer's premises. The effect of such a holding would not bar the union from picketing at all gates used by the employees, suppliers, and customers of the struck employer. Of course an employer may not, by removing all his employees from the situs of the strike, bar the union from publicizing its cause, see *Local 618* v. *Labor Board,* 249 F. 2d 332. The basis of the Board's decision in this case would not remotely have that effect, nor any such tendency for the future.

The Union claims that, if the Board's ruling is upheld, employers will be free to erect separate gates for deliveries, customers, and replacement workers which will be immunized from picketing. This fear is baseless. The key to the problem is found in the type of work that is being performed by those who use the separate gate. It is significant that the Board has since applied its rationale, first stated in the present case, only to situations where the independent workers were performing tasks unconnected to the normal operations of the struck employer—usually construction work on his buildings.[5] In such situations, the indicated limitations on picketing activity respect the balance of competing interests that Congress has required the Board to enforce. On the other

---

[5] *United Steelworkers* (*Phelps Dodge Refining Corp.*), 126 N. L. R. B. 1367; *International Chemical Workers Union* (*Virginia-Carolina Chemical Corp.*), 126 N. L. R. B. 905; see *Union de Trabajadores* (*Gonzales Chemical Industries, Inc.*), 128 N. L. R. B. No. 116.

hand, if a separate gate were devised for regular plant deliveries, the barring of picketing at that location would make a clear invasion on traditional primary activity of appealing to neutral employees whose tasks aid the employer's everyday operations. The 1959 Amendments to the National Labor Relations Act, which removed the word "concerted" from the boycott provisions, included a proviso that "nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing." 29 U. S. C. (Supp. I, 1959) § 158 (b)(4)(B). The proviso was directed against the fear that the removal of "concerted" from the statute might be interpreted so that "the picketing at the factory violates section 8 (b)(4)(A) because the pickets induce the truck drivers employed by the trucker not to perform their usual services where an object is to compel the trucking firm not to do business with the . . . manufacturer during the strike." Analysis of the bill prepared by Senator Kennedy and Representative Thompson, 105 Cong. Rec. 16589.

In a case similar to the one now before us, the Court of Appeals for the Second Circuit sustained the Board in its application of § 8 (b)(4)(A) to a separate-gate situation. "There must be a separate gate marked and set apart from other gates; the work done by the men who use the gate must be unrelated to the normal operations of the employer and the work must be of a kind that would not, if done when the plant were engaged in its regular operations, necessitate curtailing those operations." *United Steelworkers* v. *Labor Board,* 289 F. 2d 591, 595, decided May 3, 1961. These seem to us controlling considerations.

## IV.

The foregoing course of reasoning would require that the judgment below sustaining the Board's order be affirmed but for one consideration, even though this con-

sideration may turn out not to affect the result. The legal path by which the Board and the Court of Appeals reached their decisions did not take into account that if Gate 3–A was in fact used by employees of independent contractors who performed conventional maintenance work necessary to the normal operations of General Electric, the use of the gate would have been a mingled one outside the bar of § 8 (b)(4)(A). In short, such mixed use of this portion of the struck employer's premises would not bar picketing rights of the striking employees. While the record shows some such mingled use, it sheds no light on its extent. It may well turn out to be that the instances of these maintenance tasks were so insubstantial as to be treated by the Board as *de minimis*. We cannot here guess at the quantitative aspect of this problem. It calls for Board determination. For determination of the questions thus raised, the case must be remanded by the Court of Appeals to the Board.

*Reversed.*

THE CHIEF JUSTICE and MR. JUSTICE BLACK concur in the result.

MR. JUSTICE DOUGLAS.

I did not vote to grant certiorari in this case because it seemed to me that the problem presented was in the keeping of the Courts of Appeals within the meaning of *Universal Camera Corp.* v. *Labor Board,* 340 U. S. 474, 490. Since the Court of Appeals followed the guidelines of that case (see 278 F. 2d 282, 286), I would leave the decision with it. I cannot say it made any egregious error, though I might have decided the case differently had I sat on the Labor Board or on the Court of Appeals.