Ivan C. McLEOD, Regional Director of the Second Region of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

LOCAL NO. 3, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL–CIO, Respondent.

United States District Court
S. D. New York.
June 5, 1962.

Stuart Rothman, Gen. Counsel, National Labor Relations Board, for petitioner, Clifford M. Roth, Washington, D. C., of counsel.

Harold Stern, New York City, for respondent.

DAWSON, District Judge.

This action is brought by the petitioner, the Director of the Second Region of the National Labor Relations Board (hereinafter called the Board), for a temporary injunction against the respondent under Section 10($l$) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 160($l$) (hereinafter called the Act). The injunction is sought pending the final disposition of the matters here involved which are now under consideration by the Board pursuant to a charge filed by New Power Wire & Electric Corporation (hereinafter called New Power) and P & L Services, Inc. (hereinafter called P & L). The charge alleges that respondent has engaged in and is engaging in an unfair labor practice within the meaning of Section 8(b) (4) (i) (ii) (B) of the Act, which proscribes what are commonly, though somewhat

loosely, referred to as secondary boycotts.[1]

A hearing was held by this Court on May 16, 1962, at which time testimony was taken from which the Court finds the following facts:

New Power is a licensed electrical contractor which has contracts with various owners to rewire apartment houses. P & L is an affiliated corporation that furnishes labor for the electrical rewiring contracts. The present controversy relates to picketing carried on by members of the respondent who were formerly employed by New Power or P & L. The picketing took place in front of nine different apartment buildings at various locations in New York City where New Power had entered into contracts with the owners for electrical rewiring. The picketing, which began on March 5, 1962, was conducted daily between the hours of 8:00 A.M. and 4:30 P.M., five days a week, during which hours electricians employed by New Power and P & L would normally have been working on the electrical rewiring jobs. The signs carried by the pickets read, in relevant part, as follows:

ELECTRICIANS
EMPLOYED ON THIS JOB BY
NEW POWER WIRE
and ELECTRIC CORP.
Are Not Members Of
LOCAL UNION NO. 3 I.B.E.W.
And Are Employed By
NEW POWER WIRE and ELEC-
TRIC CORP. IN VIOLATION OF
ITS AGREEMENT WITH ELEC-
TRICAL WORKERS LOCAL
UNION NO. 3

The background of the dispute between New Power and the union can be set forth briefly. For some time prior to the dispute, New Power had a collective bargaining agreement with the respondent which apparently is still in effect at the present time. In July 1961 New Power began to discharge some of its employees who were members of the respondent and to hire non-union personnel. The respondent contends that such action violated the collective bargaining agreement. Subsequently, in February 1962, the respondent organized nearly all of the sixty non-union electricians then employed by New Power or P & L, and on March 20, 1962 it filed a petition for representation with the Board. On March 30, 1962 New Power and P & L filed unfair labor practice charges against the respondent relating to the picketing above described and the Board refused to proceed with the petition for representation until the unfair labor practice charges had been disposed of. On May 2, 1962 the Board filed this application for a temporary injunction.

The basis of the Board's complaint is that the picketing by the respondent is in violation of Section 8(b) (4) (i) (ii) (B) of the Act (29 U.S.C.A. § 158(b) (4) (i) (ii) (B)). This section, as amended in 1959, provides as follows:

"(b) It shall be an unfair labor practice for a labor organization or its agents—

\* \* \* \* \* \*

"(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

\* \* \* \* \* \*

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer,

1. See Local 761, Intern. Union of Electrical etc. Workers v. N. L. R. B., 366 U.S. 667, 672–673, 81 S.Ct. 1285, 1288, 6 L.Ed.2d 592 (1961).

or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing."

Prior to the 1959 Landrum-Griffin amendments to the Act, Section 8(b) (4) of the earlier Taft-Hartley Act was more limited in scope. The former Section 8(b) (4) made it an unfair labor practice for a union to exert secondary pressure on a disputing employer by inducing or encouraging the employees of a neutral employer to engage in a work stoppage for a proscribed object. 61 Stat. 141 (1947), 29 U.S.C.A. § 158(b) (4). No provision was made for direct pressure against the neutral employer himself. The 1959 amendments retained the prohibition against employee inducement as Section 8(b) (4) (i) but added as Section 8(b) (4) (ii) a prohibition against direct coercion of a neutral employer. See Comment, The Landrum-Griffin Amendments: Labor's Use of the Secondary Boycott, 45 Cornell L. Q. 724, 726 (1960). Both issues are presented here.

█ As to Section 8(b) (4) (i), there was no convincing evidence offered at the hearing that the employees of any neutral employer were induced or encouraged to engage in a strike or refusal to handle any goods or to perform any services. No other construction was taking place in the nine apartment buildings which were picketed by the respondent, nor were union members of any other trades at work in these buildings. There was no testimony that any outside deliveries were halted or interfered with, or that the activities of the pickets were an encouragement or an inducement to other employees not to perform their regular duties. The testimony was similarly unconvincing that the picketing was directed against any of the building superintendents or maintenance personnel. Of course an unsuccessful inducement may be a violation of the Act, but there must be evidence that the union tried or wished to interfere with other workers. United Brotherhood of Carpenters v. N. L. R. B., 109 U.S.App.D.C. 249, 286 F.2d 533 (1960). No such evidence was presented here.

█ The only persons against whom the picketing might conceivably have been directed (other than New Power and P & L) would be the building owners themselves. Section 8(b) (4) (ii), which was inserted by the 1959 Landrum-Griffin amendments, declares it unlawful for a union "to threaten, coerce or restrain any person engaged in commerce or in an industry affecting commerce" for any of the stated prohibited objects.[2] This amendment therefore now covers direct pressure against neutral employers.

█ There is no evidence however in this case that the picketing was designed to "threaten, coerce or restrain" the building owners in any respect. The picketing was informational in nature, not threatening or coercive. It is true, as the Supreme Court has observed, that "the objectives of any picketing include a desire to influence others from withholding from the employer their services or trade." Local 761, Intern. Union of Electrical etc., Workers v. N. L. R. B., 366 U.S. 667, 673, 81 S.Ct. 1285, 1289, 6 L.Ed.2d 592 (1961). However, such a desire to influence a neutral employer is not in itself unlawful under the Act. Since the language of the Act as amended makes it unlawful to "threaten, coerce or restrain" a neutral employer, it is

---

2. One of the prohibited objects includes "forcing or requiring any person * * * to cease doing business with any other person * * *." 29 U.S.C.A. § 158(b) (4) (ii) (B).

still considered permissible for a union to induce, encourage or persuade a neutral to apply pressure against an offending employer.

"Though this addition severely restricts the scope of permissible secondary activity, it would appear that it does not completely foreclose appeals directed to neutral employers. In this connection it is significant that where the old language (retained as Section 8(b)(4)(i)) makes it unlawful merely to *induce* or *encourage* a neutral's employees, the new Section 8(b)(4)(ii) makes it unlawful only to *threaten, coerce* or *restrain* the neutral employer himself. Presumably, it is still permissible for a union to induce, encourage or persuade a neutral to apply pressure against the offending employer * * *." 45 Cornell L. Q., supra, at p. 727.

The Court concludes that the conduct of the respondent's pickets was not to threaten, coerce or restrain the building owners from doing business with New Power. The pickets were merely publicizing their dispute at the common situs and this is not illegal under Section 8(b)(4)(i) or Section 8(b)(4)(ii).

The Board takes the position that the principles set forth in the Moore Dry Dock Company case, 92 NLRB 547, 549 (1950), which was decided prior to the 1959 amendments, remain applicable to the present situation. That case laid down the rule that picketing of the premises of a secondary employer is to be considered primary and hence not prohibited if it meets the following conditions: "(a) The picketing is strictly limited to times when the *situs* of dispute is located on the secondary employer's premises; (b) at the time of the picketing the primary employer is engaged in its normal business at the *situs*; (c) the picketing is limited to places reasonably close to the location of the *situs*; and (d) the picketing discloses clearly that the dispute is with the primary employer."

The principles laid down by the Board in the Moore Dry Dock case have been widely accepted by federal courts, including those of the Second Circuit. See N. L. R. B. v. Service Trade Chauffeurs, 191 F.2d 65 (2d Cir. 1951); N. L. R. B. v. International Brotherhood of Teamsters, 272 F.2d 85 (2d Cir. 1959).

Accepting the Board's contention that the Moore Dry Dock tests are to be applied here, the respondent's picketing still cannot be held illegal. The testimony disclosed that at each of the sites where picketing took place, New Power and P & L had a contract for electrical rewiring and that some work was in progress from time to time. It is true that the work did not continue daily. However, supervisors employed by New Power visited the sites almost every day and from time to time they brought workers with them. Furthermore there was testimony that it was a practice in doing electrical work to move men around from job to job without fully completing the work at any one site on consecutive workdays. The evidence disclosed therefore that the pickets had reason to believe that New Power and P & L were actually engaging in some work under the contracts at the sites being picketed.

■ Since the picketing took place on the sidewalks in front of the premises where New Power had contracts to do electrical rewiring there can be no dispute that the picketing was limited to places reasonably close to the location of the situs. Furthermore, the signs carried by the pickets adequately disclosed that the dispute was with New Power, the primary employer. Therefore, this Court concludes that no violation of Section 8(b)(4)(i)(ii)(B) was shown.

The foregoing conclusion makes it unnecessary to consider the respondent's alternative defense that the requisite effect on interstate commerce is lacking under the recent decision of the Court of Appeals in N. L. R. B. v. Reliance Fuel Oil Corp., 297 F.2d 94 (2d Cir. 1961).

The application of the Board for a preliminary injunction is denied.