Thomas W. SEELER, Regional Director of the Third Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,

v.

INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL NOS. 17, 17A and 17B, AFL–CIO, Respondent.

Civ. No. 1973–515.

United States District Court,
W. D. New York.

Nov. 9, 1973.

On Motion for Reconsideration
Jan. 4, 1974.

Francis J. Novak, Jr., Atty., N.L.R.B., Third Region, Buffalo, N. Y., for petitioner.

Lipsitz, Green, Fahringer, Roll, Schuller & James, Buffalo, N. Y., (Richard Lipsitz, Buffalo, N. Y., of counsel), for respondent.

CURTIN, District Judge.

This proceeding is before the court on a petition filed by the Regional Director of the National Labor Relations Board pursuant to Section 10(*l*) of the National Labor Relations Act [Act] [29 U.S.C. § 160(*l*)] for a temporary injunction pending the final disposition of a charge filed by Firelands Sewer and Water Construction Co., Inc. [Firelands]. That charge alleged that respondent has engaged in unfair labor practices within the meaning of Section 8(b)(4) (i, ii) and (ii), subparagraph (B) of the Act. On October 24, 1973, respondent was ordered to show cause on October 29, 1973 why a temporary injunction should not issue pending the Board's final disposition of the charge. A hearing was held on October 30, 1973 and the following constitutes the court's findings of fact and conclusions of law made as a result of that hearing.

Firelands has a contract with the Buffalo Sewer Authority [Sewer Authority] to remove two million yards of fill from the Squaw Island waste facility located in the Niagara River and to transport this material by barge six miles south to the Tifft Street area in the Buffalo harbor. Firelands entered into a contract with Dunbar and Sullivan Dredging Co. [Dunbar and Sullivan] to construct a dock on Squaw Island and extending into the Black Rock Channel, and also to move the material by barge to the Tifft Street area. Dunbar and Sullivan in turn contracted with Herbert F. Darling, Inc. [Darling] to assist in the construction of the dock at Squaw Island. Firelands intends to have its own employees do the work on the island, including moving the material to the dock for barge transportation. Respondent has a labor dispute with Firelands, a non-union contractor, but does not have any dispute concerning this work with either Dunbar and Sullivan, Darling or the Sewer Authority. The employees of Dunbar and Sullivan and of Darling are union members, but do not belong to the respondent Union.

On July 11, 1973, a group of Buffalo area union representatives met with representatives of the Sewer Authority to protest the possibility of awarding this contract for the removal of the decomposed garbage to Firelands. During direct examination, a representative of the Sewer Authority testified that he recalled that Thomas McPartlan, a busi-

ness agent for Local 17, had said at that meeting that if the contract were awarded to Firelands his union would go on strike. However, during cross-examination he was not certain that this was the statement made by Mr. McPartlan and perhaps McPartlan said that the union may picket. The union representatives who were present at the meeting testified that McPartlan said that if the contract were awarded to Firelands, his union would engage in informational picketing and that he never said that Local 17 would go on strike. The court will credit the testimony of the union representatives.

The contract was awarded to Firelands and, in the early fall, it began its work at the jobsite. Squaw Island, roughly about a mile long and about one-eighth to a quarter of a mile wide, is separated from the mainland to the east by the Black Rock Channel. To the west of Squaw Island is the Niagara River. A rough sketch of the island was marked in evidence as petitioner's Exhibit 1. The decomposed material to be moved is spread out over the northerly two-thirds of the island. This area is separated from the southerly portion by a fence which runs across the island from east to west. A gate is located in the fence on the easterly side of the island near the Black Rock Channel. Employees of Firelands use the gate to go into the work area. A roadway leads to the south from the gate, along the Channel about two hundred feet to the westerly end of the Ferry Street Bridge. The Ferry Street Bridge, located near the southerly end of Squaw Island, extends over the Black Rock Channel to the mainland. In the north end of the island, access to the mainland is gained by a roadway which runs parallel to the International Railroad Bridge, which runs from Squaw Island to the mainland. Up to the present, most of the work of the Firelands' employees has been located in an area about 2500 feet north of the gate on the east side of Squaw Island at the dock site. This proceeding is concerned mainly with al-

leged unlawful picketing near the gate and extending south along the roadway leading from the bridge to the gate, and with picketing by boat in the Black Rock Channel. Picketing was also conducted to the north near the International Railroad Bridge, but no complaint is made about the picketing conducted in that area.

The actual construction of the dock was subcontracted by Firelands to Dunbar and Sullivan. In turn, that company subcontracted the pile driving for the dock to Darling.

Picketing began in an area between the Ferry Street Bridge and the gate to the Firelands' work area, about 150 feet to the north on October 9, 1973. The picket signs read as follows:

> Employees of Firelands are employed to perform operating engineers' work on this job, under wage and other conditions of employment inferior to those enjoyed by employees represented by operating engineers Local 17, 17–A and 17–B.

On the following day, respondent, with the use of a similar sign, began picketing with a motor boat in the Black Rock Channel. At times the boat proceeded up the Channel to the north in the area of the dock site but principally the picket boat circled between the Ferry Street Bridge and the point in Squaw Island about 200 feet to the north where the fence and gate were located.

In preparation for its work, Darling set up a supply depot a few feet north of the Ferry Street Bridge on the mainland. On about October 10, 1973, Dunbar and Sullivan moved a barge into the west side of the Channel, slightly to the north of the Ferry Street Bridge and south of the Sewer Authority gate at a Squaw Island mooring. The plan was to cross the Channel to the east, load up with the Darling supplies and then move the barge to the north to the proposed dock site. Picketing by boat began at about the time the barge was moored in the Channel, but arrangements to have the boat pickets in the Channel were

made a day or two previous. There were five or six pickets on Squaw Island who walked back and forth along the access road leading from the Ferry Street Bridge to the Sewer Authority gate. This path led them past the barge and, upon occasion, some pickets were seen on the barge.

There was no evidence that any of the Dunbar and Sullivan employees assigned to the barge refused to perform any services, in spite of the fact that the picket boat sometimes moored to the barge. Mr. Hedley, in charge of the work for Dunbar and Sullivan, testified that he talked to the pickets but they never urged him or anyone else on the barge to take any part in the dispute. He did not ask them to leave the barge or not to moore their boat there.

Roy Shafer, in charge of the work for Darling, testified that on October 18 his men were working in the Darling supply area when he saw Richard Chaffee, one of the respondent's pickets come into the Darling area and engage in a brief conversation with some of the Darling employees. While Chaffee was there, he turned his picket sign around so that the writing was not visible. Mr. Shafer did not hear any of the conversation and none of the men who conversed with Mr. Chaffee were called as witnesses. Shafer said that one of the men told him that they would not move the material on to the barge because of the pickets. Beyond this hearsay testimony, there was no evidence that the Darling employees would not work or that Shafer gave them any direction to do any work. The Dunbar and Sullivan barge was not moved from the west to the east side of the Channel and there is no evidence to show that the employees of Dunbar on the barge would not have moved it across the Channel if they were directed to do so. A few days after the 18th, Dunbar and Sullivan moved the barge from the Channel to another mooring in the Buffalo harbor.

On October 16, 1973, Firelands filed a charge with the NLRB claiming that the respondent Union induced and encouraged individuals employed by Dunbar and Sullivan and Darling to strike and not to handle materials or do work for Firelands, with an object of forcing these companies to cease doing business with Firelands. This petition for a temporary injunction followed.

■ Upon a 10(l) application, it is the duty of the District Court to determine, first, whether the Director has reasonable cause to believe that the charges filed were true and, secondly, whether the issuance of an injunction would be just and proper under the circumstances. McLeod v. Local 25, International Brotherhood of Electrical Workers, 344 F.2d 634 (2d Cir. 1965), and McLeod v. National Maritime Union of America, AFL–CIO and Seafarers International Union of North America, 457 F.2d 490 (2d Cir. 1972).

Under the facts presented at this hearing, the petitioner has failed to satisfy the court that the Director had reasonable cause to believe that respondent is in violation of Section 8(b)(4)(i)(ii), subparagraph (B) of the Act, or that the issuance of an injunction would be just and proper.

■ In order to be unlawful, the activity of respondent in this case must have been directed toward forcing Dunbar and Sullivan and Darling to cease doing business with Firelands. N.L.R.B. v. Denver Building and Construction Trades Council, 341 U.S. 675, 687, 71 S.Ct. 943, 95 L.Ed. 1284 (1950); Local 761, Electrical Workers v. N.L.R.B., 366 U.S. 667, 672–674, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961). The facts developed at the hearing do not indicate that respondent's activity had such an objective. There was nothing improper in the conversation between the representatives of the Sewer Authority and the representatives of the area unions at their meeting in July when the union representatives stated that they would engage in informational picketing if the contract went to Firelands. There was

no evidence developed at the hearing of any threatening acts by any of respondent's pickets or any words or conduct attempting to induce the employees of Dunbar and Sullivan or Darling not to work. The picket signs were informational in character and were directed at Firelands' employees. There was evidence that picketing by boat and by land was in the vicinity of the Dunbar and Sullivan barge and the Darling work area, but it is clear from the cases that the location of pickets near the work site of neutral employees, while important, does not in and of itself establish an objective to violate the law. Local 761, Electrical Workers v. N.L.R.B., *supra* at 681, 81 S.Ct. 1285; United Steelworkers of America v. N.L.R.B., 376 U. S. 492, 497, 84 S.Ct. 899, 11 L.Ed.2d 863 (1964).

Petitioner has referred the court to the case of Reynolds v. Plumbers Local 155, 79 LRRM 2224, where the District Court issued a 10(*l*) injunction but, in that case, the court found that conversations between the neutral company and union representatives tended to establish that one of the objectives of the picketing was to force the neutral company to cease doing business with those who did not use union labor. In Teamsters 126 and Ready Mixed Concrete, Inc., 200 N. L.R.B. No. 41, another case referred to the court by petitioner, respondent union was charged with unlawfully picketing construction sites where cement was being delivered. In finding the picketing unlawful, the Board noted that the union admitted its purpose was to put Ready Mixed out of business and that the picketing was directed not toward the employees of Ready Mixed, but was directed toward the employees of the contractors doing business with that company. The court finds that the facts in this case are distinguishable from the facts in both of those cases. Because injunctive relief under Section 10(*l*) of the Act is not appropriate, the petition is denied.

So ordered.

## ON MOTION FOR RECONSIDERATION.

This proceeding was originally brought on a petition filed by the Regional Director of the National Labor Relations Board pursuant to Section 10(*l*) of the National Labor Relations Act for a temporary injunction pending the final disposition of an unfair labor practice charge filed by Firelands Sewer and Water Construction Co., Inc. [Firelands]. A hearing was held on the petition before this court on October 30, 1973 and, on November 9, 1973, this court filed a decision and order denying the temporary injunction. On November 19 and 20, 1973, an unfair labor practice hearing was held on the Firelands charge before Thomas D. Johnston, Administrative Law Judge of the National Labor Relations Board.

Based upon two grounds, petitioner now urges the court to reconsider its decision of November 9, 1973. The court heard oral argument on the motion to reconsider on December 7, 1973 and has considered all the material submitted by the parties, including briefs, the transcript of the hearing before the Administrative Law Judge and the exhibits introduced at that hearing.

The first ground urged by petitioner on the motion to reconsider is that, during the N.L.R.B. hearing, evidence was developed which showed that respondent's picketing was designed not to inform the public but to force neutrals to cease doing business with Firelands. In support of this contention, petitioner points to the testimony of Thomas McPartlan, respondent's business agent, who testified that, although the wording of the picket signs protested the inferior wage scale paid by Firelands, he was not aware of the actual difference, if any, between the wages paid by Firelands and the wages received by employees represented by respondent.

The second ground for reconsideration urged by petitioner is that an incident occurring November 14, 1973 between respondent's pickets and the employees

of a neutral, Dunbar and Sullivan Dredging Co. [Dunbar and Sullivan], demonstrates that the object of respondent's picketing is to enmesh secondary employers and their employees in the labor dispute between respondent and Firelands, in violation of the National Labor Relations Act. The incident occurred as a Dunbar and Sullivan tug was proceeding up the Black Rock Channel. As the tug passed the area where respondent's pickets were located, there was a verbal exchange between a representative of Dunbar and Sullivan and respondent's pickets. The tug turned around and did not proceed further up the Channel. The facts of the incident are disputed. Petitioner claims that, when the Dunbar and Sullivan tug came into the vicinity of respondent's pickets, the pickets stated that they were picketing Dunbar and Sullivan. Respondent denies that such a statement was made and maintains that Dunbar and Sullivan were not being picketed. The testimony of both sides was presented at the N.L.R.B. hearing and is part of the record of that proceeding.

 The court finds that, upon these facts and upon the grounds cited by petitioner, reconsideration of this court's decision of November 9, 1973 is inappropriate. Considering petitioner's first ground. Mr. McPartlan testified before this court at the hearing on the temporary injunction on October 30, 1973. He was thoroughly cross-examined by petitioner and asked about the wording of the picket signs. The information developed at the N.L.R.B. hearing by petitioner certainly could have been developed at the hearing before this court if petitioner had inquired. Because this evidence was available to petitioner with reasonable diligence at the time of the hearing, it should not prompt the court to reconsider its decision denying the 10(*l*) injunction. *See* Plisco v. Union Railroad Company, 379 F.2d 15 (3d Cir. 1967); 7 J. Moore, Federal Practice § 60.23 [4] n. 4.

 Regarding the incident occurring on November 14, 1973, the court finds that those events are properly before the Administrative Law Judge of the National Labor Relations Board, but should not be considered by this court. Section 10(*l*) of the National Labor Relations Act provides an orderly method for the consideration of charges of unfair labor practice. At the hearing before this court on the temporary injunction, evidence was presented which led the Regional Director of the N.L.R.B. to believe there was reasonable cause to believe an unfair labor practice had been committed. Upon consideration of that evidence, the court denied the injunction. The court finds that the events occurring subsequent to this court's decision of November 9, 1973 were presented to, and will be considered by, the Administrative Law Judge. Orderly procedure and the finality of decisions require that this evidence be considered by the N.L.R.B. and not be used as a basis for reopening this court's decision denying the 10(*l*) injunction.

Furthermore, since the facts about the events of November 14, 1973 are seriously disputed, there is no reason to suppose that, even if this testimony were considered as part of the 10(*l*) record, it would change the result.

The petitioner's motion for reconsideration is denied.

So ordered.