**SERVICE EMPLOYEES INTERNATIONAL UNION, AFL–CIO, CLC, LOCAL 525, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

and

**Washington Square Limited Partnership, Respondent— Intervenor.**

No. 00–70139.

NLRB No. 5–CB–6558.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 10, 2001.

Decided Dec. 3, 2002.

Before FERNANDEZ, KLEINFELD, and McKEOWN, Circuit Judges.

MEMORANDUM *

The NLRB applies for enforcement of its order. Petitioner seeks nonenforcement and remand for further proceedings.

The SEIU's conduct targeted, not the prospective members, nor the employers of those prospective members, but rather the landlords and tenants of the

---

* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36–3.

buildings to which the employers sold janitorial services and at which the prospective members worked for the independent contractors providing the services.

The NLRB concluded that the SEIU violated the NLRA, including sections 8(b)(1)(A), 4(i), and (ii)(B), by numerous acts directed at secondary parties. It carefully analyzed the evidence and SEIU's arguments that the secondary parties forfeited their neutrality by allying with the employers, and found that "Respondents unlawfully sought to enmesh these neutral individuals and entities" in its dispute with the contractors.

The SEIU does not challenge any of the NLRB's findings of fact. Rather, its argument is that on the NLRB's own findings, it should have concluded as a matter of law that the landlords and tenants, and the lawyers representing their association, had thrust themselves into the labor dispute and had become allies of the employers.

Because the employees worked for the independent contractors at the landlords' and tenants' premises, established common situs law controls. *Sailors Union (Moore Dry Dock)*, 92 NLRB 547, 1950 WL 9143 (1950), establishes the terms of the exception to the rule against secondary pressures:

(a) The picketing is strictly limited to times when the situs of the dispute is located on the secondary employer's premises;

(b) at the time of the picketing the primary employer is engaged in its normal business at the situs;

(c) the picketing is located at places reasonably close to the location of the situs; and

(d) the picketing discloses clearly that the dispute is with the primary employer.

*Id.* at 549. The *Moore Dry Dock* criteria and associated "reserved gate" doctrine are well established in the law and parties have for many years relied on them. *See Local 761 (Machine Workers) v. NLRB*, 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961); *NLRB v. Ironworkers Local 433*, 850 F.2d 551, 554 (9th Cir.1988). The NLRB's finding that SEIU did not comply with at least two of these four requirements (SEIU picketed and demonstrated from 6:00 P.M. to 10:00 P.M., when no employees were present but rush hour disruption was maximized) is supported by substantial evidence.

SEIU urges us to extend *Moore Dry Dock*'s reserved gate exception to remote hours. *See Local 453 (Southern Sun Electric Corp.)*, 237 NLRB 829, 1978 WL 7881 (1978) and *H.L. Robertson & Associates, Inc.*, 171 NLRB 251, 1968 WL 18708 (1968) (where the reserved gate is so remote or inaccessible that so confining the picketing would eliminate the union's ability to draw public attention to the labor dispute). SEIU argues that because the employee's hours were shifted to very late hours, picketing confined to those remote, limited hours would deprive SEIU of the opportunity to inform the public.

We do not reach the question of whether the remote location exception to the reserved gate exception applies where the remoteness derives from time rather than place. In this case, SEIU directed its picketing so exclusively toward secondary purposes rather than toward the employers and employees that the ALJ found that the union "chose to picket at times which would maximize their ability to reach not only the public, but also Washington Square's owners and tenants;" the ALJ also found that the Union's entire campaign evidence an intent to involve the secondary employer in the dispute. Most strikingly, the letter from the building

owner-landlord's attorneys advised the union that no employees would be at the site "between the hours of 4:00 p.m. and 10:00 p.m.," but left open the possibility that employees *would* be at the site earlier in the day. In fact, as the testimony showed without contradiction, some USSI employees *did* work during the day, just not between 4:00 p.m. and 10:00 p.m. SEIU did not picket at other hours of the ordinary business day, when the employees who were the nominal object of its campaign may have been present, and focused its picketing on hours and locations when the union knew the employees would be absent.

Thus conformity to the *Moore Dry Dock* criteria would not have prevented SEIU from drawing public attention to the dispute. The SEIU could have conformed to *Moore Dry Dock* by means of permissible and lawful conduct during the day when this busy business corridor in Washington D.C. would have been packed with people. Even if the remote location exception to the reserved gate exception did extend to time as well as place, it would have no application to this case, because employees' presence at the site was not limited to "remote" times.

■ SEIU also argues that the landlords, tenants, and their attorneys made themselves "allies" of the employers under *General Teamsters Local 959 v. NLRB*, 743 F.2d 734, 736–39 (9th Cir.1984), thereby excepting themselves from the prohibition against secondary pressures. This argument cannot succeed without a determination that the NLRB's fact findings were clearly erroneous, because the NLRB found that the landlords' and tenants' conduct was a defensive response to the SEIU's determination to involve them in a labor dispute not their own, and their attorneys' involvement was part of their defensive posture of trying to avoid enmeshment rather than to advance the employers' goals.

■ Well established "ally" doctrine requires that the union establish either that the putative ally perform struck work that but for the strike would not have been sent to them, or fall into the category of "those who, because of common ownership, control and integration of operations, become so identified with the primary employer that they are treated as a single enterprise or 'straight-line operation.'" *Teamsters Local 560 (Curtis Matheson)*, 248 NLRB 1212, 1980 WL 10903 (1980).

The landlords, tenants and attorneys did not perform struck work. They did not have common ownership, control or integration of operations with the employers. Far from controlling the employers, they sought to remain out of the dispute, and as the NLRB found, their attorneys' advice focused on how to stay out of it, while the SEIU tried from the beginning to enmesh them. Ally doctrine does not permit secondary action against non-employers merely because some of them have a preference or economic interest disserved by the prospective union.

The NLRB decision is AFFIRMED and ENFORCED, and the petition for review is DENIED.