John A. PENELLO, Regional Director of the Fifth Region of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

BALTIMORE LITHOGRAPHERS AND PHOTOENGRAVERS UNION, LOCAL 2-P, LITHOGRAPHERS AND PHOTO-ENGRAVERS INTERNATIONAL UNION, AFL-CIO

and

Lithographers and Photoengravers International Union, AFL-CIO, Respondents.

Civ. No. 16570.

United States District Court
D. Maryland.

Aug. 9, 1965.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Julius G. Serot, Asst. Gen. Counsel, NLRB, Washington, D. C., David C.

Sachs, Regional Atty., and Walter H. Maloney, Jr., Atty., NLRB, Baltimore, Md., for petitioner.

Samuel Kimmel, Towson, Md., for the Local.

Samuel Edes, Chicago, Ill., for the International.

James P. Garland, Baltimore, Md., for the charging party.

THOMSEN, Chief Judge.

In this proceeding under section 10(*l*) of the National Labor Relations Act, as amended[1] (the Act), a Regional Director of the National Labor Relations Board (the Board) seeks a temporary injunction against respondents (the Baltimore Local and the International), pending the final disposition by the Board of a charge filed by Alco-Gravure Division of Publication Corporation (Alco), alleging that respondents have engaged in and are engaging in unfair labor practices within the meaning of section 8(b) (4) (i) and (ii) (B) of the Act.

That subsection, as amended in 1959, provides in pertinent part:

"It shall be an unfair labor practice for a labor organization or its agents * * *

"(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or othewise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten,

coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

"* * * * * *

"(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of Section 9 of this title: *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

"* * * * * *"

The petition filed herein is based on petitioner's conclusion that there is reasonable cause to believe that respondents have engaged in the unfair labor practice charged and that a complaint of the Board based on that charge should issue. The injunctive relief prayed is interlocutory to the final determination of the charge pending before the Board. The Court must decide from the evidence taken at the hearing in this court proceeding whether petitioner had reasonable cause to believe that there had been such a violation and whether the injunctive relief requested is just and proper.[2] The principal question is whether section 8(b) (4) (i) and (ii) (B) should be construed to apply to the factual situation presented by this case.

1. Sept. 14, 1959, 73 Stat. 544, 29 U.S.C.A. § 160(*l*).

2. N. L. R. B. v. Denver Bldg. & Construction Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951); Department & Specialty Store Emp. Union, Local 1265, R.C.I.A., AFL–CIO v. Brown,

9 Cir., 284 F.2d 619, 628 (1961); Madden v. International Organization, etc., 7 Cir., 259 F.2d 312, 313–314 (1958); McLeod for and on behalf of N. L. R. B. v. Local 27, Paper Products & Misc. Chauffeurs, etc., E.D.N.Y., 212 F.Supp. 57, 62 (1962).

*Findings of Fact*

There is little if any dispute about the basic facts, none about the jurisdictional facts set out in note [3] below.

Alco is engaged at Glen Burnie, Maryland, and elsewhere in producing rotogravure printed material. It has two plants at Glen Burnie, a processing plant and a printing plant, in which it produces inter alia Sunday supplements, both monotone and four-color, for the Baltimore Sun, the Washington Star and the Philadelphia Bulletin, and catalogs for companies such as Sears Roebuck. Only the color work is involved in this case.

Respondent International was formed in 1964 as a result of the merger of the lithographers' and photoengravers' unions. Respondent Baltimore Local is the local which has jurisdiction over Glen Burnie. The branches of work done by its members include photography, retouching-layout, etching, re-etching, staging, printing and laydown, grinding and plating, and finishing.

Printing Developments Incorporated (PDI) is engaged in the business of developing and selling new products and procedures to the printing industry. It has plants in New York, Chicago and other cities.

The New York and Chicago Locals of the International have agreements with PDI which are approved by the International. The Baltimore Local and some other locals of the International, including the New York Local, have contracts with Alco.

3. 1. Petitioner is Regional Director of the Fifth Region of the Board, an agency of the United States, and filed the petition herein for and on behalf of the Board.

2. (a) On or about June 21, 1965, Alco Gravure Division of Publication Corporation, pursuant to provisions of the Act filed a charge with the Board alleging, inter alia, that Baltimore Lithographers and Photoengravers Union Local 2-P, Lithographers and Photoengravers International Union, AFL–CIO (herein called Baltimore Local), a labor organization, has engaged in, and is engaging in, unfair labor practices within the meaning of section 8(b) (4) (i) and (ii), subparagraph (B), of the Act.

(b) On or about July 13, 1965, Alco Gravure, pursuant to the provisions of the Act, filed a similar charge against Lithographers and Photoengravers International Union, AFL–CIO.

3. The charges were referred to petitioner as Regional Director of the Fifth Region of the Board.

4. There is reasonable cause to believe that:

(a) Respondents, the Baltimore Local and the International, unincorporated associations, are organizations in which employees participate and which exist for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

(b) At all times material herein Charles Ochs has been President of respondent Baltimore Local.

(c) Respondent Baltimore Local maintains its principal office in Baltimore, Maryland, and at all times material herein has been engaged within this judicial district in transacting business and in promoting and protecting the interests of the employee members of respondent Baltimore Local.

(d) Respondent International maintains its principal office in New York, New York, and at all times material herein respondent International and its agents have been engaged within this judicial district in transacting business and in promoting and protecting the interests of the employee members of respondent International and its member locals.

(e) Alco Gravure is engaged at Glen Burnie, Maryland, in producing rotogravure printed material. In the operation of its business, it annually receives goods and materials from outside the State of Maryland valued at in excess of $50,000, and annually ships products outside the State of Maryland valued at in excess of $50,000.

(f) Printing Developments, Inc. (herein called PDI), is engaged at New York, New York, in the manufacture, sale and distribution of scanned positives. It annually receives from and ships to points outside the State of New York, goods, materials, or products valued at over $50,000.

(g) In the course of its business, PDI regularly sells products to Alco Gravure, among others.

Until recent years the procedure usually followed in gravure printing (following the receipt of a kodachrome transparency or other copy from the customer) involved: (1) the production by a photographic process of four negatives, one for red, one for yellow, one for blue and one for black; (2) the production therefrom of four positives, and the checking of the positives for color balance; (3) the production from the positives of a roto film or etching film, used for etching on copper; (4) the production of copper cylinders; and (5) the printing of the proofs and final product.

In the 1950's PDI developed a process for producing electronically scanned negatives suitable for use in preparing color plates for gravure printing, offset printing and letter-press printing. From 1963 until early in 1965 Alco sent 90–95% of its kodachromes to PDI for the preparation of scanned negatives, from which the employees of Alco produced the positives and carried out the subsequent steps outlined above. In emergency situations, or where there was an unusual press of work, Alco would send kodachromes to "supply houses", which would produce both negatives and positives by traditional methods, returning them to Alco for the subsequent steps.

Some time before December, 1964, PDI developed a procedure for producing electronically scanned positives. It is the only company which produces and sells such positives to the trade. The only other machines capable of producing such electronically scanned positives are owned and used by individual printers. In December, 1964, Alco considered the possibility of having some electronically scanned positives produced by PDI. Tests were made and it was found that they could be produced at approximately the same cost as that incurred by Alco when it produced its own positives from electronically scanned negatives, and more cheaply than the cost to Alco of having the work done by independent supply houses using traditional methods.

The proposed use of scanned positives caused concern to Ochs, the President of the Baltimore Local; he promptly contacted officials of the International and the New York Local, stating that in his opinion the obtaining by Alco of such electronically scanned positives amounted to subcontracting work regularly done by members of the Baltimore Local and violated the collective bargaining agreement between Alco and the Baltimore Local.[4]

4. ARTICLE II of the Collective Bargaining Agreement reads as follows:

"Section 1. Employees engaged to do work as defined in Section 2 following shall be employed in accordance with terms and conditions hereinafter set forth:

"Section 2. All material to be reproduced for printing purposes shall serve as copy and be processed and/or completed under present or future operations by employees covered by this agreement.

"Section 3. The process of rotogravure photo-engraving and its attendant work thereto and the jurisdiction thereof is defined as being, and is all parts of the process pertaining to the production of rotogravure photo-engraving from copy, original subjects, negatives, positives, rotofilm and/or carbon tissue up to the finished plates, films or cylinders, including photography, making of masks for color separation and drop-out purposes, retouching including opaqueing cylinder layout work, printing, transferring, and sensitizing of carbon tissue, staging, etching, re-etching, finishing, cylinder stripping, plating and grinding, and the making of silver, or velox prints; any type of proofing performed in the Engraving Department; operating devices for making color separations by electronic methods; marking of both monotone and color proofs for correction; and also grading, mixing, and the use of rotogravure chemicals used in these processes as well as such kindred photo-engraving processes as may be developed or introduced; and shall be performed by qualified journeymen and apprentices; excluding, however, any and all matter having to do with office or management records.

"The making from copy of negatives or positives of type, hand-lettering, illustrative and decorative material by the method of photography as presently practiced by members of the I.P.E.U. of N.A., is part of the process of photoengraving as

At that time some of the officers of the International apparently felt that since PDI employed union men to do the work and had collective bargaining agreements with locals of the International, it would not be proper for the Baltimore Local to refuse to allow Alco to use PDI scanned positives. After being informed of the view of these International officers, Ochs discussed the matter with Alco's plant manager and wrote him on December 17, 1964, that while the union did not wish to put roadblocks in the path of progress, there was a possible threat to employment or job security of members of the Local. The letter continued: "I have spent quite a bit of time in exploring the possibilities of this (in our opinion) change of practice on acceptance of the positive materials and feel that, in view of your statements, no one should be hurt by their use at this time. While we do not accept the use of the positive separations from the PDI scanner, we reserve the right to raise the question again whenever it would be evident that their use constitutes a serious threat to the employment or job security of our members."

Consequently, in January, 1965, Alco began to use the PDI scanned positives for commercial production. Although scanned positives can only be used for certain types of work, e. g., "one shot" pages, during the period from January 1 to May 30, 1965, more than 35% of the positives used by Alco were produced by the PDI scanner. Since Alco's business increased substantially during that period, there were no lay-offs, but few if any additional men were hired.

On February 19 Ochs again wrote the International about the effect which the use of scanned positives was having and would have upon employment and job security. He reiterated his position that the use of scanned positives represented a change of practice and amounted to subcontracting the Local's regular work. There had been some misunderstanding among the International officers with respect to International's position on the matter, and on March 5 International Vice-president Hall tried to clear up these misunderstandings. He told Ochs that the Chicago and Detroit Locals had advised rotogravure employers in their cities that scanned positives would only be accepted as copy for the camera and not for direct use. Hall "advised" Ochs to take the same position in Baltimore and assured him that the International would support this position. However, Ochs learned from Alco's plant manager that the New York Local was permitting the Alco plant at Hoboken, N. J., to ac-

defined. Stripping and printing of these negatives and positives is also part of the process of photo-engraving as defined. Where these negatives and positives are to be combined with the product of the photo-typesetter, which is received as copy, by the method of stripping as presently practiced by members of the I.P.E.U. of N.A., they shall continue to be stripped by members of the I.P.E.U. of N.A.

"Jurisdiction of the I.P.E.U. also includes handling and processing of the products emanating from the photo-type-setter.

"Should the Employer install any equipment or adopt any work-processes designed as a substitute for, or evolution of, work now being done by photo-engravers, the Employer agrees to recognize the jurisdiction of the I.P.E.U. of N.A. over such equipment and work processes.

"Section 4. No member of the Union shall be required to handle struck work, or to cross a picket line, in instances where a strike has been called by the International Photo-Engravers Union of N.A. The right of the individual workers as set forth under the caption SAVING PROVISION, Section 502 of the Labor-Management Relations Act, 1947, is recognized by both parties to this agreement, and the exercise of these rights shall not be construed as a violation of this agreement, so long as said Act is in effect.

"Section 5. The following are the recognized branches of work covered by the agreement:

"1. Photography

"2. Retouching—Layout

"3. Etching, Re-etching, Staging, Printing, and Laydown

"4. Grinding and Plating

"5. Finishing

"Present practices are not to be changed as a result of the adoption of the five branches of classification listed above.

cept the PDI positives. Ochs wrote Hall on March 14 discussing the problems facing the Baltimore Local, and said: "Inasmuch as you mention that the PDI contract comes up in May 1965, it may be well to begin to think along the lines of control of the scanner and the type of work that we will accept from it. This looks like quite a problem, to me, but certainly something will have to be done to keep the work within bounds. I intend to contact the New York Local on this to see what their actual position is, but I feel that if we are to eliminate the problem here it will take a coordinated effort by both locals, so that we will know where we are going." Meanwhile the Baltimore Local did not refuse to work on PDI scanned positives.

The negotiations between PDI and the several locals with which it dealt were conducted in Chicago. The unions at first demanded that PDI abandon completely the production of scanned positives. When it developed that this would be economically unfeasible, and that PDI sells more than 95% of its scanned positives to offset and letter-press printers (which do not have contracts with the Lithographers and Photoengravers locals), and sells considerably less than 5% to rotogravure printers (who do have such contracts), settlement was reached upon an agreement that no scanned positives will be produced by PDI for rotogravure printers without the consent of the Local where the scanners' studio is located. So far as the Glen Burnie plant is concerned, such consent must come from the New York Local; the Baltimore Local cannot control the decision.

Sometime before May 30, the Baltimore Local realized that Alco's Glen Burnie plant was obtaining scanned posi-

tives from PDI not only in emergency situations or where there was an unusual press of work, but in the normal course of its production, to the extent of 35–40% of all positives used. Also, before May 30, Hall directed Ochs to refuse to accept PDI scanned positives for any use other than as copy for the camera. On May 30 Ochs so advised Alco by letter, and ordered its Chapel Chairman to see that the members of the Local were so instructed.

It is not economically feasible to use scanned positives as copy for the camera, and the Local's refusal to accept them for any other use amounts practically to an absolute refusal to work on the scanned positives. Indeed, respondents do not deny that the letter of May 30 and the subsequent refusal by members of the Baltimore Local to work on the scanned positives amounted to a partial strike.

On June 8 Alco's plant manager replied to the letter of May 30, taking the position that the Local's action was unwarranted under the terms of the collective bargaining agreement, and stating: "If there is a misunderstanding as to the use of the P.D.I. Scanned Positives, we insist that it be handled in accordance with Article XIII of the Collective Bargaining Agreement. Section Two of that article requires that the working and other conditions prevailing immediately prior to the action that initiates the dispute be preserved unchanged until a decision shall have been rendered. This means, quite simply, that it is your duty and that of your members to continue to accept and use the P.D.I. Scanned Positives, without limitation, until the misunderstanding is resolved." Article XIII of the Agreement is set out in note [5] below.

5. "ARTICLE XIII—Grievance-Arbitration

"Section 1. A joint Industrial Council shall be created, consisting of two representatives selected by the Employer (or Employers where two or more Employers are joint parties to the agreement) and two representatives selected by the Union. All disputes or misunderstandings, including any alleged breach of contract, which cannot be adjusted by conciliation within a reasonable period of time, shall be referred to the Joint Industrial Council for consideration, adjustment and decision. Conditions to control a new agreement or renewal of an expiring agreement shall not be subject to the Grievance-Arbitration procedure.

Ochs replied on June 11, stating: "Inasmuch as we have not refused to handle positive scans there is no dispute and your demands that this be handled in accordance with Article XIII of the present agreement are refused * * *" and reaffirming the position taken in the letter of May 30.

Alco made no further effort to enforce arbitration, but filed charges against the Baltimore Local on June 21 and against the International on July 13.

### Findings of Conclusory Facts and Discussion

█ Petitioner contends that there is reasonable cause to believe that the Baltimore Local, by its refusal to permit its members to handle scanned positives produced by PDI and by informing Alco of that refusal or partial strike, have engaged in an illegal secondary boycott, in violation of section 8(b) (4) (i) and (ii) (B). It further contends that the International used the Baltimore Local to effectuate its nationwide policy, and so became a party to the violation.

This Court finds, however, that there was a primary dispute between the Baltimore Local and Alco over terms and conditions of employment. The Baltimore Local has consistently contended that the action of Alco during the winter and spring of 1965 in obtaining scanned positives from an outside source, not only in emergency or work-pressure situations, but also as a part of its normal operations, constituted subcontracting or contracting out of work normally done by members of the Baltimore Local, and violated the collective bargaining agreement. Whether or not the Local's contention is ultimately held to be sound, the evidence shows that it was made by the Local in good faith. Similar contentions formed the basis of disputes between the Chicago and Detroit Locals and other branches of Alco. Support by the International of similar positions taken by its several locals does not convert a series of primary disputes into illegal activity.

Petitioner contends, however, that the timing of the Baltimore Local's refusal was dictated by the International in order to force Alco to bring pressure against PDI to yield to the demands of the New York, Chicago and Detroit Locals, supported by the International in their negotiations with PDI. When the decision to file this suit was made, petitioner did not know of the correspondence between the Baltimore Local and the International from December, 1964, to March, 1965, which establishes the concern the Local has had from the first over the possible loss of present and potential

"Failing to reach a decision within ten (10) days after submission of all facts, a fifth member shall be added to the Council. Should the Joint Industrial Council fail to agree upon a fifth member within ten (10) days, the selection of the fifth member shall be made by the President of the International Photo Engravers Union of North America and a designated representative of the employers or by the American Arbitration Association, as may be mutually determined.

"A majority decision of the Council, as thus constituted, shall be final and binding, and must be rendered within seven (7) days—unless extended by mutual consent —after the additional member has been selected.

"The cost of transporting, maintaining and compensating the fifth member shall be borne equally by both parties.

"In no event and under no circumstances, insofar as its internal affairs are concerned, shall any decision be in conflict with or disregard any of the provisions in the Constitution or General Laws of the I.P.E.U. of N.A.—except to the extent that such provisions may be found to be in conflict with Federal or State Laws.

"Section 2. Working and other conditions prevailing immediately prior to the action that initiates the dispute (except discharge for cause) to be decided by the Joint Industrial Council shall be preserved unchanged until a decision has been rendered.

"Section 3. In consideration of the foregoing arrangement (excepting discharge for cause) for the adjustment of grievances or settlement of disputes, both parties to the agreement accept this procedure as the sole and exclusive method of seeking adjustment or redress prior to instituting any proceedings in courts."

jobs. From the information then at hand it was a natural inference that the object of the Baltimore Local's refusal to work on the PDI scanned positives was to induce Alco to bring pressure on PDI to accede to the demands being made on it. But the fuller record now available, including not only the correspondence between the Baltimore Local and the International, but also the history of the negotiations with PDI, and other testimony, show that the primary concern of the Baltimore Local has at all times been the possible loss of present and potential jobs at Glen Burnie. There is still a permissible inference that the timing of the Baltimore Local's refusal to use the scanned positives was influenced by the negotiations the other locals were then conducting with PDI, and I find that such secondary purpose was a factor, but a minor factor, in the refusal of the Baltimore Local to work on the scanned positives.

■ It is true, as argued by petitioner, that a strike may be an unfair labor practice within the meaning of section 8(b) (4) if one of the objects of the strike is a forbidden object; the proscribed object need not be the sole object of the strike. N. L. R. B. v. Denver Building & Const. Trades Council, 341 U.S. 675, 689, 71 S.Ct. 943, 95 L.Ed. 1284 (1951); Int'l Brotherhood of Electrical Workers et al. v. N. L. R. B., 341 U.S. 694, 700, 71 S.Ct. 954, 95 L.Ed. 1299 (1951); New York Mailers Union No. 6, ITU v. N. L. R. B., 136 NLRB 196, mod. 114 U.S.App.D.C. 370, 316 F.2d 371 (1963). But the forbidden object must be an *object*, and not an *effect*. N. L. R. B. v. Service Trade Chauffeurs, 2 Cir., 191 F.2d 65 (1951); International Longshoremen's Local Union No. 19 and Vance, 137 NLRB 119 (1962).

■ In the instant case, the Baltimore Local had no dispute with PDI. That fact alone would not prevent its action from violating section 8(b) (4)

(i) and (ii) (B). N. L. R. B. v. Local Union 751, etc., 9 Cir., 285 F.2d 633 (1960). But it is a fact which should be considered. Rabouin v. N. L. R. B., 2 Cir., 195 F.2d 906, 912 (1952). It points up the fact the Baltimore Local's objection was to the routine use of scanned positives, because it felt that such use was a threat to the job security of its members.[6] That the scanned positives came from PDI was incidental; PDI happened to be the only company which produced scanned positives for the trade. The Baltimore Local made no objection to Alco's obtaining scanned negatives from PDI, and refrained from refusing to work on the scanned positives early in 1965 partly because of assurances given to the Local by Alco's plant manager.

Under these circumstances, the Court finds that there is no reasonable ground to believe that the alleged illegal object played more than a slight role in the refusal of the members of the Baltimore Local to work on the scanned positives.

There is no case precisely in point, and the Courts have found it difficult to draw sharp lines in this area. Local 761, International Union of Electrical, etc., Workers v. National Labor Relations Board, 366 U.S. 667, 672, 673, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961). Probably the most helpful opinion is Retail Clerks Union Local 770, etc. v. N. L. R. B., 111 U.S.App.D.C. 246, 296 F.2d 368 (1961).

I conclude that the legal, primary object of the strike was so clear and so strong that the slight part played by an illegal, secondary object does not, on this record, justify a conclusion that respondents have engaged in unfair labor practices within the meaning of section 8(b) (4) (i) and (ii) (B).

■ Even if this conclusion is wrong, it would not be just and equitable to issue an injunction in this case. Whatever part the proscribed object may have played in May 1965, while negotiations between the other locals and PDI were

---

6. This distinguishes the instant case from so-called "hot cargo" cases, such as Local 1976, United Brotherhood of Carpenters,

etc. v. National Labor Relations Board, 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958).

in progress, that part has shriveled into insignificance now that those negotiations have been completed and agreement reached. An improper object which is no longer operative may be the basis for an NLRB order, because such object may again become operative in the future, but it does not justify a temporary injunction under section 10($l$) where a proper, primary object is continuing and was at all times dominant.

For the foregoing reasons the requested injunction must be and it is hereby denied, without prejudice to the right of petitioner to apply for an injunction hereafter, if a change in circumstances warrants such application.