**John A. PENELLO, Regional Director of Region 5 of the National Labor Relations Board, For and on Behalf of the NATIONAL LABOR RELATIONS BOARD,**

**v.**

**LOCAL 829, INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL–CIO, et al.**

**Civ. No. 71–1241–M.**

United States District Court,
D. Maryland.

Nov. 17, 1971.

Charles B. Slaughter and Harvey A. Holzman, Baltimore, Md., for National Labor Relations Board, Region 5.

Cosimo Abato and Thomas E. Bracken, Baltimore, Md., for all Local Unions (829, 921, 1429, 1355, 858, and 953, International Longshoremen's Association, AFL-CIO).

Thomas W. Gleason and Julius Miller and Gleason & Miller, New York City, for International Longshoremen's Association, AFL-CIO, and International Longshoremen's Association Atlantic Coast Dist., AFL-CIO.

## MEMORANDUM OPINION AND ORDER

JAMES R. MILLER, Jr., District Judge.

This is a proceeding pursuant to section 10(*l*) of the National Labor Relations Act, 29 U.S.C. section 160(*l*), in which the petitioner seeks the issuance of an injunction on the ground that there is reasonable cause to believe that respondents have engaged in certain unfair labor practices. A hearing on the issues raised by the petition was held on November 11 and November 15, 1971. All parties were afforded a full opportunity to be heard, to examine and cross-examine witnesses, to present evidence bearing on the issue, and to argue the evidence and the law.

The court's function in this proceeding is not to determine the ultimate fact of whether or not a proscribed unfair labor practice has occurred, but is instead to determine whether or not there is evidence, which if believed, could lead a reasonable person to believe that an unfair labor practice has occurred. McLeod v. Local 282, International Bro. of Teamsters, etc., 345 F.2d 142, 145 (2d Cir. 1965); Schauffler v. Local 1291 International Longshoremen's Ass'n, 292 F.2d 182, 187 (3d Cir. 1961); Kennedy v. Sheet Metal Workers International

Assoc. Local 108, 289 F.Supp. 65, 86–87 (C.D.Cal.1968); Jaffee v. Henry Heide, Inc., 115 F.Supp. 52, 57 (S.D.N.Y.1953).

The court finds the following facts.

Petitioner is Regional Director of Region 5 of the National Labor Relations Board (hereinafter termed "Board"), an agency of the United States, and filed this petition for and on behalf of the Board.

On or about October 27, 1971, Steamship Trade Association of Baltimore, Inc., on behalf of its Employer-Members (herein called STA), pursuant to provisions of the Act, filed charges with the Board each of which charge respectively alleges, *inter alia*, that Local 829, International Longshoremen's Association, AFL-CIO; Local 921, International Longshoremen's Association, AFL-CIO; Local 1429, International Longshoremen's Association, AFL-CIO; Local 1355, International Longshoremen's Association, AFL-CIO; Local 858, International Longshoremen's Association, AFL-CIO; Local 953, International Longshoremen's Association, AFL-CIO; International Longshoremen's Association, AFL-CIO; and International Longshoremen's Association, Atlantic Coast District, AFL-CIO (herein individually called Local 829, Local 921, Local 1429, Local 1355, Local 858, Local 953, ILA, Atlantic Coast District or collectively respondents) labor organizations, have engaged in, and are engaging in, unfair labor practices within the meaning of Section 8(b) (4) (i) and (ii), subparagraph (B) of the Act.

The aforesaid charges were referred to petitioner as Regional Director of Region 5 of the Board.

Respondents, and each of them, unincorporated associations, are organizations in which employees participate and which exist for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment or conditions of work. Respondents Local 829, Local 921, Local 1429, Local 1355, Local 858, and Local 953 maintain their principal offices at Baltimore, Maryland, and at all times material herein all of respondents have been engaged within this judicial district in transacting business and in promoting and protecting the interests of their employee members. Respondents Atlantic Coast District and ILA maintain their principal offices at Baltimore, Maryland and New York, New York, respectively, and at all times material herein each of said respondents has been engaged within this judicial district in transacting business and in promoting and protecting the interest of employee members of constituent or affiliated labor organizations.

STA is a Maryland corporation composed of various employers engaged in the performance of shipping, stevedoring and related services in the port of Baltimore, Maryland. STA exists, in part, for the purpose of representing its employer members in the negotiation of collective bargaining agreements with various labor organizations, including respondents which represent various employees of members of STA. Members of STA realize annual revenues of well in excess of $1,000,000 for the transportation of cargo in interstate and foreign commerce and well in excess of $1,000,000 for services performed in connection with the transportation of cargo in interstate and foreign commerce.

At all times material herein respondents have been engaged as the exclusive bargaining representative in various units appropriate for the purposes of collective bargaining for employees of various employer members of STA engaged in the loading, unloading, handling and other duties in connection with the movement of cargo in and through the port of Baltimore.

From 1957 through 1968 New York Shipping Association (hereinafter called NYSA), an association of employers engaged in the performance of shipping, stevedoring, and related services in the port of New York, pursuant to binding authority from counterpart associations and other ports on the Atlantic Coast from Hampton Roads to Maine, includ-

ing STA, bargained with ILA in New York as to five (5) master contract items. These were (1) wages, (2) hours, (3) contribution to welfare funds, (4) contribution to pension funds, and (5) effective dates of collective bargaining agreements. Traditionally these items were then embodied in local agreements negotiated for each port by ILA and affiliated locals in each North Atlantic port. The most recent contract applicable to the port of Baltimore was effective from October 1, 1968 to September 30, 1971. It was negotiated on behalf of the ILA, the Atlantic District of the ILA, and the respective ILA affiliated locals in Baltimore on the one hand,[1] and STA on the other hand and includes the aforesaid five master contract items, which were bargained for through NYSA, as well as other locally bargained issues such as guaranteed annual income (hereinafter referred to as GAI).

On January 14, 1971, STA and its counterpart associations in other North Atlantic ports formally withdrew from NYSA its authority to engage in any contract negotiations with ILA. In June 1970, the Council of North Atlantic Shipping Associations (herein called CONASA) had been formed by NYSA, STA, Hampton Roads Shipping Association, Boston Shipping Association, Inc., Rhode Island Shipping Association, and Philadelphia Marine Trading Association. STA notified Thomas W. Gleason,

president of the ILA, and William Haile and John Kopp, International vice president and Atlantic Coast District vice president, respectively, on or about January 22, 1971, that it had withdrawn negotiating authority from NYSA.

Repeating information previously given to Mr. Gleason at a meeting in November, 1970, Mr. James J. Dickman advised Mr. Gleason, president of the ILA, by letter of June 17, 1971 (Petitioner's Exhibit No. 1), that he had been elected president of CONASA, that CONASA represented the STA and other shipping associations for the purpose of collective bargaining, that CONASA's bargaining authority had been extended to include "Containerization"[2] and "LASH"[3] as additional master contract items in response to a prior request therefor by the ILA but that all CONASA authority was subject to the acceptance by ILA of five (5) preconditions. The letter requested a reply by July 30, 1971, as to whether the ILA would agree to commence negotiations with CONASA subject to the five (5) preconditions. ILA never did agree to accept the five (5) preconditions for CONASA's negotiating authority set forth in the aforesaid letter.

At a meeting of the ILA hierarchy, together with respresentatives of the affiliated local unions and representatives of the employers in the North Atlantic ports comprising the membership of

---

1. Actually, there are seven (7) separate contracts applicable to the port of Baltimore, as follows: (1) a container agreement between all Baltimore locals of the ILA, the ILA itself, and the STA; (2) a GAI agreement between all Baltimore locals of the ILA, the ILA itself, and STA; (3) Local 921 agreement signed only by that local, the ILA, and STA; (4) Locals 858 and 829 agreements signed by said locals, the ILA, and the STA; (5) Local 953 agreement signed by that local, the ILA, and the STA; (6) Local 1355 agreement signed by that local, the ILA, and the STA; and (7) Local 1429 agreement, signed by that local, the ILA, and the STA.

2. This term refers to the labor saving practice of preloading containers, ranging in size from approximately 20 feet to approximately 40 feet in length, which are then shipped by rail or highway to shipside where the entire preloaded container is hoisted and stowed on board ship. Generally, at the port of destination the container then follows the reverse process to the point where the container is opened and the contents distributed.

3. This term is an abbreviation of the phrase "lighter aboard ship" and refers to a labor saving practice under which specially fitted ships can hoist and load on board up to 71 barges, each barge having previously been loaded with approximately 350 tons of cargo.

CONASA, on August 18, 1971, Mr. Gleason, president of ILA, told the employers' representatives that he would not agree to the five (5) preconditions for CONASA's negotiating authority and that he adhered to the view of "one port down, all ports down." In addition, Mr. Gleason said that he did not necessarily want GAI as a master contract item, but that he insisted that the procedural sytem underlying GAI had to be the same in all ports. At the August 18, 1971, meeting Mr. Dickman, the president of NYSA as well as of CONASA, was the spokesman for all of the employers, including STA.

On August 26, 1971, a meeting was held between the STA and the ILA Baltimore locals which had been arranged by Mr. Fortune, executive director of STA, and Mr. Haile. All locals were represented except for Local 921. Each local presented written demands for proposals on a variety of subjects, including an increase in the guaranteed hours under GAI to Two Thousand Eighty (2,080), changes in GAI work and eligibility rules, increased vacation allowance, changes in the seniority system relative to dispatches and the hiring hall, changes in holiday allowances, and elimination of certain arbitration and grievance procedures. Some of the locals included in their written list of proposals excerpts from Joint Respondent Exhibit No. 1, a list of ILA proposals which had been alluded to by Mr. Gleason at the August 18, 1971, meeting. There was some confusion at the meeting as to whether any of the proposals discussed were so-called national issues as opposed to local issues. There was no discussion as to why the various proposals were wanted by the respective locals, and the meeting broke up without any date being set for resumption of discussions. The STA was going to review the demands.

On August 31, 1971, the members of CONASA had a meeting in Washington, D. C. and adopted the following resolution:

"Resolved that CONASA proposes to the ILA that each Port (ILA and management) negotiate locally on the issue of guaranteed income at the earliest possible moment, and, on resolution of such issue, bargaining shall commence immediately thereafter between the ILA and. CONASA on the seven master contract issues."

By a letter of that date to Mr. Gleason, James Dickman, as president of CONASA, advised the ILA of the CONASA resolution while at the same time reaffirming the previously stated five (5) preconditions to the authority of CONASA to negotiate. The aforesaid resolution was adopted unanimously by the employer associations comprising CONASA.

To implement the CONASA resolution Mr. Fortune arranged through Mr. Haile for a meeting between STA and the ILA locals on September 3, 1971. At the meeting STA said that it had called the meeting solely to discuss GAI. STA then offered, on a take it or leave it basis (Tr. 158), to extend the local GAI contract for one year from October 1, 1971, through September 30, 1972. The union representatives stated that the existing GAI contract guaranteed only one thousand eight hundred (1,800) hours whereas they wanted two thousand eighty (2,080) hours. In addition, they stated that any discussion of GAI should include a discussion of seniority and the hiring center and dispatchers. The STA representatives responded that they would not discuss at that meeting any of the other matters which the local ILA unions stated were related to GAI and repeated the STA offer to extend the existing GAI contract for one (1) year. Certain members of the locals present expressed their resentment that STA would not discuss at that meeting any of the other demands. Mr. Fortune testified that the locals at that meeting rejected the STA offer although Mr. Haile stated that he would "take the offer back to New York." (Tr. 157–

159.) At the conclusion of that meeting, in the words of Mr. Fortune:

" * * * I don't know whether you would call it an impasse or not, but they did not agree. *The parties did not agree locally.*" (Tr. 159.) (Emphasis supplied.)

In the meantime, negotiations commenced on September 2, 1971, in New York on GAI for the Port of New York. These negotiations were conducted by Mr. Dickman, as president of NYSA, and the Wage Scale Committee of the ILA on behalf of the ILA and its New York locals.

Although both sides deny fault, there is evidence from which one could reasonably find that Mr. Fortune attempted to arrange at least two (2) meetings with Mr. Haile, presumably for the purpose of discussing GAI in the port of Baltimore. Mr. Fortune testified that he had arranged a meeting on September 14 or 15, 1971, but that the meeting was canceled by Mr. Haile. He further testified that on approximately September 24, 1971, another meeting was scheduled at his request but that it was canceled by Mr. Haile. In each case Mr. Haile stated that the meeting had to be canceled because the ILA representatives were in New York on ILA business. The evidence would further indicate that there may have been a meeting arranged by Mr. Fortune of STA for September 28, 1971, but it is clear that no meeting took place until September 30, 1971.

At that meeting Mr. Detweiler for STA asked to be brought up to date on the situation in general. Mr. Haile replied that the Wage Scale Committee of

ILA and its executive board had agreed that work would continue after midnight that night during the term of the presidential wage-freeze order [4] if the employer's organization of each port " * * * from Searsport, Maine to Brownsville, Texas individually extended their present agreements * * *." (Tr. 113.) Mr. Haile further stated that there was no purpose negotiating during the life of the freeze. (Tr. 113–114.) [5] After a caucus the STA representatives returned with a written offer to extend the existing contracts until midnight on November 12, 1971, the termination of the wage-freeze. Said offer was good for a period of forty-eight (48) hours. (Petitioner's Exhibit No. 4.) When the offer was made, the STA representatives believed, based on Mr. Haile's prior statement, that " * * * it would be worthless if the other ports didn't follow the same course." (Tr. 117.)

By prearrangement, Mr. Haile called Mr. Fortune at approximately 7 p. m., on the evening of September 30, 1971. He told Mr. Fortune that he had just heard from Mr. Gleason who was on a supper break from the negotiations in New York, " * * * that it looked very bad and that unless he [Haile] heard from him [Gleason], to pull all men at midnight except for military, for military cargo." (Tr. 121; see also Tr. 198.) At that time, the *only negotiations in* New York were those relating to GAI in the port of New York.

Mr. Walter L. Sullivan, secretary to the ILA Wage Scale Committee, testified that at approximately 10 p. m., on September 30, 1971, Mr. Andrew Gibson,

---

4. Exec.Order No. 11,615, August 15, 1971.

5. This statement is subject to at least two interpretations. Mr. Haile could have meant that the union was agreeing to the extension of the present contracts until the expiration of the wage-freeze since any contract, monetarily more favorable to the ILA and its locals could not be implemented until the expiration of the wage-freeze in any event although a new contract could be negotiated in the meantime postponing the monetarily more favorable provisions until expira-

tion of the said wage-freeze. On the other hand, Mr. Haile's comments could be interpreted as a flat statement that no negotiations would take place during the contract extension. This interpretation seems tenuous in view of the fact that negotiations did in fact take place after September 30, 1971. The statement will be viewed, however, in the light most favorable to the petitioner's position, i. e., that Mr. Haile stated that there would be no negotiations during the wage-freeze period.

Assistant Secretary of Commerce, and Mr. William Ussery, Assistant Secretary of Labor, proposed to Mr. Dickman and to Mr. Gleason that the ILA contracts should be extended for two months in all ports from Maine to Virginia, during which time all contract items should be negotiated. Mr. Sullivan testified that the "employers" held a caucus after which they returned and rejected the government's proposition. It is not clear from the record whether the "employers" referred to were strictly representatives of NYSA or whether they purported to speak for employers in all the Atlantic Coast ports. Since the former interpretation is most favorable to the petitioner herein, said interpretation shall be accepted by the court for the purposes of this opinion.

At 12:01 a. m., on October 1, 1971, all ILA locals in Baltimore went on strike.

On or about October 3, 4, or 5, 1971, Mr. Dickman told Mr. Gleason that if GAI could be resolved, then the seven master contract items could be negotiated in twenty-four (24) hours. At a meeting in Cherry Hill, New Jersey, on October 17 or 18, 1971 between NYSA and the Wage Scale Committee of ILA, Mr. Dickman, apparently wearing his other hat as chairman of CONASA, asked Mr. Sullivan to arrange hotel accommodations for a meeting the following week between the CONASA representatives and the ILA Atlantic Coast District to negotiate the seven master contract items. According to Mr. Sullivan, both Mr. Dickman on behalf of the respective port employers, and Mr. Gleason on behalf of the ILA, indicated that a precondition of the meeting would be an agreement on GAI in each respective port. Since there was no such agreement, the proposed meeting in Miami in the latter part of October never took place.

With that factual background, the Board contends that the strike in Baltimore has as its object the forcing, requiring, inducing, or encouraging of shippers, importers, and other persons to cease doing business with members of STA in furtherance of the dispute between ILA and its New York locals with NYSA in violation of 29 U.S.C. § 158(b)(4) (i) and (ii), subparagraph (B).

The pertinent sections of the Act read as follows:

"(b) It shall be an unfair labor practice for a labor organization or its agents * * *

"(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is:

" * * * (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing."

In the court's view, the resolution of the question presented under the unusual facts of this case cannot be found in the recitation of formulae or tests derived in other factual contexts to distinguish between permissible primary strike activity and impermissible "secondary boycotts." The answer instead is found in the application of the dual congressional objectives of the pertinent statute. It has been said that those ob-

jectives are the preservation of " * * the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and * * * [the] shielding [of] unoffending employers and others from pressures in controversies not their own." National Labor Relations Board v. Denver Bldg. & Const. Trades Council, 341 U.S. 675 at 692, 71 S.Ct. 943, at 953, 95 L.Ed. 1284 (1951). Accordingly, section 8(b) (4) (B) [and its predecessor section, section 8(b) (4) (A)] has not been read

" * * * to ban traditional primary strikes and picketing having an impact on neutral employers even though the activity fell within its sweeping terms. Labor Board v. International Rice Milling Co., 341 U.S. 665 [71 S. Ct. 961, 95 L.Ed. 1277] ; see Local 761, Electric Workers v. Labor Board, 366 U.S. 667 [81 S.Ct. 1285, 6 L.Ed.2d 592]. Thus, however severe the impact of primary activity on neutral employers, it was not thereby transformed into activity with a secondary objective." National Woodwork Manufacturers Assn. v. NLRB, 386 U.S. 612 at 627, 87 S.Ct. 1250 at 1259, 18 L.Ed.2d 357 (1967).

Similarly, the literal terms of the statute were not applied:

" * * * in the so-called 'ally doctrine' cases, in which the union's pressure was aimed toward employers performing the work of the primary employer's striking employees. The rationale, again, was the inapplicability of the provision's central theme, the protection of neutrals against secondary pressure, where the secondary employer against whom the union's pressure is directed has entangled himself in the vortex of the primary dispute." Id. at 627, 87 S.Ct. at 1259.

Stated another way, section 8(b) (4) (B) " * * * is not an escape hatch for an obviously involved employer." Local No. 742, United Bro. of Carpenters and Join. v. N.L.R.B., 444 F.2d 895 at 900 (D.C.Cir.1971). The substance, motivation and history of the particular dispute must not be ignored.

In the present case, therefore, the touchstone, to paraphrase the Supreme Court in *Woodwork Manufacturers*, is whether the alleged illegal action of the respondents is addressed to the labor relations of STA vis-a-vis the employees of STA's members. If so, then the strike cannot be illegal secondary activity because, among other reasons, the STA is not then an unoffending neutral employer enmeshed in a controversy not its own.

In this case the respondent unions have not admitted that their act in striking the members of the STA was done with an illegal intent. In the absence of admissions by the union of an illegal intent, the nature of the acts performed shows the intent. Local 761, International Union of Electrical Radio and Mach. Workers v. National Labor Relations Board, 366 U.S. 667, 674, 81 S. Ct. 1285, 6 L.Ed.2d 592 (1961).

Here the facts show that the ILA local unions in Baltimore have no contract with the STA. They further show that the STA has not made any offer or proposal on any item relating to a proposed new contract except a "take it or leave it" offer on September 3, 1971, to extend the previous GAI agreement on the same conditions and terms for one year. Although STA now takes the position that no organization is authorized to negotiate for it on any contract proposal, STA has made no other contract proposals of its own [6] except for the temporary expedient of offering a contract extension through the end of the wage freeze. Even though STA now attempts to disassociate itself from the CONASA resolution of August 31, 1971, its only affirmative offer to the ILA and its local unions was made pursuant to and as a result of said CONASA resolution. Mr. Dickman, who at one moment wears the hat of the chairman of NYSA, at the next moment wears the hat of the

6. The court is not considering any negotiations which may have taken place between the parties subsequent to the institution of this proceeding.

chairman of CONASA.[7] The facts further show that the Baltimore locals have traditionally struck at the termination of their contracts where no new agreement had then been negotiated, the traditional position of the ILA and its locals being "no contract, no work." To say that the Baltimore locals do not have a primary dispute with the STA is to ignore the substance and history of the dispute.

The foregoing considerations lead me to conclude that the STA is not an unoffending neutral employer which has become embroiled in a controversy not its own. The STA, with Mr. Dickman of NYSA and CONASA as its spokesman in at least some respects, has entangled itself in the vortex of the primary dispute.

■ The Board, however, argues that at least one object of the strike was to support the ILA in the negotiations in New York related solely to GAI in that port. It is true that several cases have held that it is not necessary to find that the sole object of the strike was illegal activity in violation of section 8(b) (4) (B) in order for the strike to constitute a proscribed unfair labor practice. National Labor Relations Board v. Denver Bldg. & Const. Trades Council, *supra* at p. 689, 71 S.Ct. 943; see also, National Labor Relations Board v. Wine, Liquor and Distillery Workers Union, 178 F.2d 584 (2d Cir. 1949). It is true that a strike may have several "objects." The term used in the statute is *an* object, not *the* object. But this language, as indeed is the case with the entire statute, must be read in conjunction with the underlying congressional purposes of this section of the Act. It is to protect, as previously stated, an unoffending neutral employer from controversies not his own. The court has found no case, and no case has been cited to it, in which the right of a union to strike, where the previous collective bargaining agreement has expired and no new one has yet been negotiated, has been prohibited because an object of the strike was also deemed to be the forcing of some persons to cease doing business with the employer on matters unrelated to any primary dispute with that employer. Here, the local ILA unions do not have an agreement with STA on any contract provision, much less on GAI as it relates to Baltimore. To say that the Baltimore locals struck because the New York locals had no agreement on GAI in New York when in fact there was no agreement on GAI in Baltimore is an exercise in semantics and does not comport with the ultimate objectives of the statute. Where there is unrefuted and, in fact, undenied evidence of a primary dispute of the ILA Baltimore locals with the STA on at least the issue of GAI, the right of the locals to strike which is specifically preserved not only by section 8(b) (4) (B), but also by section 13 of the Act, would effectively be eliminated by acceptance of the position of the Board in this case.

The only evidence which really supports the Board's position as to the alleged illegal object of the strike is the statement of Mr. Haile on the telephone to Mr. Fortune on the evening of September 30, 1971. While it is true that the language used would reasonably be interpreted to refer to the NYSA negotiations in New York as being "bad," in the light of the background of the events such an interpretation does not result in an automatic finding that the strike in Baltimore was called for reasons unrelated to the labor relations of STA vis-a-vis its own employees. At the time there was, as pointed out previously, no agreement in Baltimore as to any item which would normally be included in a new contract. As a matter of fact, STA had not made any official comment or offer to the ILA or its Baltimore locals on any of said items with the exception of GAI. In the words of Mr. Fortune, the STA and the ILA "did not agree

---

7. Compare Miami Newspaper Pressman's Local No. 46 v. NLRB, 116 U.S.App. D.C. 192, 322 F.2d 405 (D.C.Cir. 1963), where the employers had common ownership, but the management and collective bargaining on behalf of each was completely separate and conducted by separate individuals.

locally," nor, for that matter, had STA expressed any opinion to the locals or the ILA on any of the items which had previously been negotiated regionally as master items. The ILA and its locals certainly had a right to strike in Baltimore at the expiration of its contract. But they indicated that they would extend the then existing contracts temporarily to the expiration of the wage freeze if the other ports' employer associations would similarly agree to the temporary extensions. As it turned out, the port of New York employers refused to extend the contracts temporarily on that basis, thereby eliminating the self imposed conditions of the Baltimore locals on their otherwise unrestricted right to strike in support of their dispute with their own employers caused by the expiration of their contract. The imposition of the condition that all ports agree to the extension was not itself illegal because STA had previously intertwined its own actions with those of the other ports (1) when it adopted and acted on the CONASA resolution of August 31, 1971, and (2) when it, albeit conditionally, through CONASA agreed to bargain regionally on the so-called seven master contract items, thereafter failing to make any offers or take any steps on its own to discuss the master contract items when it became apparent that the preconditions to CONASA's authority had not been accepted by ILA.

The court does not believe that the Baltimore ILA locals struck STA with the conscious object of doing so in support or furtherance of the ILA and its locals in their dispute with NYSA in New York. While the action of the Baltimore locals may have that effect, such effect does not render otherwise lawful primary activity any the less lawful. Retail Clerks Union Local 770 v. N.L.R.B., 111 U.S.App.D.C. 246, 296 F.2d 368, 373 (D.C.Cir. 1961); Penello v. Baltimore Litho. & Photoengravers Union, 244 F. Supp. 279, 286 (D.C.Md.1965).

Even assuming, however, that the Baltimore strike had as an object when it started an illegal object to support the ILA and its New York locals in the New York dispute with NYSA, I find that said alleged illegal object had such a minor part in the strike decision and implementation as to be de minimis. Under the unusual circumstances of this case, the slight part such an illegal object might have played in the strike cannot nullify the clear primary and legal object which did play a vastly greater part. Penello v. Baltimore Litho. & Photoengravers Union, id.

For all of the aforegoing reasons, the court is unable to find, on this record, reasonable cause to believe that the respondents have engaged in an unfair labor practice prohibited by section 8(b) (4) (B) of the Act.

Not unmindful of the admonition by Mr. Justice Frankfurter that " * * * the distinction between legitimate 'primary activity' and banned 'secondary activity' . . . does not present a glaringly bright line," Local 761, International Union of Electrical, Radio and Mach. Workers v. National Labor Relations Board, 366 U.S. 667 at 673, 81 S.Ct. 1285 at 1289, I am constrained to say that even if I were in error in my conclusion on the "reasonable cause" question, I do not believe it would be "just and proper" to grant the requested injunction in this case.

The existence of the primary dispute between STA and the respondents has been commented upon earlier. That dispute gives the respondents a clear right to strike in support of their efforts to obtain a new contract to their liking. As a practical matter, it would be meaningless to issue an injunction today to require the strike to end when tomorrow the respondents theoretically could go out on strike on their primary dispute which remains essentially as unresolved now as it was on September 30, 1971. In addition, when there is a proper and continuing primary object for a strike, at least in this case where the striking unions have no contract, an injunction would severely impair or impede the respondents' admitted primary right to strike by placing them in the position of

being in contempt of court if their actions were deemed to be in support of the New York locals whereas the same actions would be proper if construed to be in support of their efforts to obtain a Baltimore contract acceptable to them. Such an injunction would, under the circumstances of this case, give STA an unfair bargaining advantage and would not, therefore, be just and proper.

After having listened to the testimony in this matter for two days, the court feels obliged to say that neither STA nor the ILA and its Baltimore locals emerge from the record as free from their respective share of guilt in allowing this strike to occur and continue. Untold economic and other damage has been sustained by all parties to the dispute, but most particularly by the public. The court urges both sides to "get on with it" and commence serious bargaining.

For the foregoing reasons, it is this 17th day of November, 1971 by the United States District Court for the District of Maryland,

Ordered that the requested temporary injunction be, and it is hereby, denied, and it is further

Ordered that the petition of the Board be, and it is hereby, dismissed.