425 F.2d 385
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
NASHVILLE BUILDING & CONSTRUCTION TRADES COUNCIL,
International Brotherhood of Electrical Workers Union, Local 429, and
Laborers International Union of North America, Local 386, AFL-CIO, Respondents.
 No. 19609.
 United States Court of Appeals, Sixth Circuit.
 April 13, 1970.
 
 Lawrence I. Kipperman, National Labor Relations Board, Washington, D. C., for petitioner; Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, John I. Taylor, Atty., National Labor Relations Board, Washington, D. C., on the brief.
 Carrol D. Kilgore, Nashville, Tenn., for respondents; Cecil D. Branstetter, Nashville, Tenn., on the brief.
 Before WEICK, CELEBREZZE and McCREE, Circuit Judges.
 WEICK, Circuit Judge.
 
 
 1
 This case is before us on application of National Labor Relations Board for enforcement of an order issued against Respondents, Nashville Building & Construction Trades Council (Council), International Brotherhood of Electrical Workers Union, Local 429 (Electrical Workers), and Laborers International Union of North America, Local 386, AFL-CIO (Laborers), for violations of the National Labor Relations Act as amended, 29 U.S.C. § 151 et seq. The Decision and Order of the Board are reported at 172 NLRB No. 105.
 
 
 2
 The Board, with one member dissenting, found that the Council and Electrical Workers violated Section 8(b) (4) (i) and (ii) (B) of the Act by picketing at a construction site with an object of forcing or requiring H. E. Collins Contracting Co., Inc. (Collins), a general contractor, to cease doing business with its nonunion subcontractors, Smith-Waller Contracting Company (S&W), Eatherly Construction Company (Eatherly), and F. K. Holland Company (Holland). The Board also found that Laborers violated Section 8(b) (4) (i) (B) of the Act by inducing employees of an employer, with whom it had no dispute, to engage in a strike with an object of forcing or requiring Collins to cease doing business with the same nonunion subcontractors. The Board's decision reversed the trial examiner, who had found that only Laborers was guilty of an unfair labor practice.
 
 
 3
 The general contractor, Collins, was contacted in the Spring of 1967 by a developer who was interested in building a shopping center near Nashville, Tennessee. Some time prior to this, Collins had built a similar shopping center for this developer subcontracting the work to union companies, with the exception of electrical and mechanical subcontractors who were nonunion. The developer asked Collins to build on the same basis as before. In order to do this, Collins needed assurances from local labor organizations that he would be able to use nonunion electrical and mechanical subcontractors without being picketed.
 
 
 4
 In order to obtain the necessary assurances that there would be no picketing, Collins' president, Jolley, arranged a meeting with the business agents of the unions that would be working the job, which meeting was held in the Carpenters' Hall. At this meeting Jolley was told that there was a sufficient number of members of the Council present and in agreement to prevent a strike sanction from being voted.[1] As a result of having received these assurances, Collins asked for bids on the subcontracting. Holland and S&W bid a price more than $46,000 less than union companies' bids for the electrical and plumbing work. After receiving these bids, some time in early September Jolley again met with the group of business agents who again assured him that he could award the electrical and plumbing subcontracts to nonunion companies without fear of being picketed. As a result, subcontracts were awarded to the nonunion subcontractors.
 
 
 5
 About September 19th the executive secretary of the Council contacted Jolley and requested a meeting, which was held the next day in the Labor Temple. When Jolley arrived at this meeting he was told by the business agent of either the Glaziers or Roofers, both of whom apparently had been present at the earlier meeting, that there was a picket sanction on the job. The executive secretary of the Council was also present. Immediately thereafter the business agents of some of the mechanical crafts and Electrical Assistants, who had not been present at the earlier meetings in the Carpenters' Hall, came in and informed Jolley that they were going to picket the job. Jolley told the group at this meeting that he had already committed himself to subcontractors[2] and that the only course of action he could take was to turn the whole job over to a nonunion general contractor. The business agents then suggested that Jolley meet with some union subcontractors to see if something could be worked out. Such a meeting was held on approximately September 26th, but to no avail.
 
 
 6
 After the unsuccessful meeting with the union subcontractors, Jolley contacted S&W and Holland. He told them that the job would probably be shut down. In order to prevent this, they agreed to have their men obtain temporary union cards, if the unions would agree.
 
 
 7
 On October 4th Jolley met with the business agents of the electrical and mechanical unions to let them know what he had worked out with S&W and Holland. These agents agreed to meet with the subcontractors.
 
 
 8
 Some time in the middle of October the deputy business agents of the electrical and of the plumbers unions met with Waller of S&W; however, the only arrangement which the unions were willing to enter was a contract to furnish men to S&W for all jobs. This was unacceptable to S&W.
 
 
 9
 All efforts to avoid picketing having failed, Jolley had signs erected which restricted the use of the gates into the job site. The job site[3] was a twenty-acre tract, the east side of which extended a distance of 900 feet along Mt. Pleasant Pike, a highway. The future main entrance to the shopping center was to be within this 900 feet; however, during the relevant periods the job site could not be entered by vehicular traffic from this east side. The back or west side of the site was bounded by a creek; the north was bounded by a fence; and the south was bounded by a public driveway. During relevant periods vehicular traffic had access to the site at only three places. Two entrances had been leveled so the workers could drive into the site: one, at the north end of the site, was accessible from the highway; the other, at the south end, opened into the public driveway. These entrances were called the north and south gates, respectively. Vehicles could enter the site also through a service station which was under construction on the southeast corner of the site, at the intersection of the highway and the public driveway, about 150 feet from the south gate.
 
 
 10
 Jolley had signs placed at the north and south gates on October 17th. The sign at the north gate, which was to be used by nonunion companies, read:
 
 
 11
 "Entry to be used only by
 F. K. Holland Co.
 S & W Contr. Co.
 Etherly [sic] Const. Co."
 
 The sign at the south gate read:
 
 12
 "Entry to be used only by
 H. E. Collins Contr. Co.
 Employees"
 
 
 13
 On October 23rd two pickets appeared at the job site carrying signs which read:
 
 
 14
 "Picketing
Smith & Waller Electric Co.
Sub-Standard Wages &
Working Conditions
I.B.E.W. — L.U. 429"
 
 
 15
 At 5 o'clock a. m. the next day, October 24th, the signs at the gates were removed and replaced by new ones which were reworded on advice of counsel. The new sign at the north gate read:
 
 
 16
 "Notice
 "This entrance reserved for
Smith-Waller Co. Inc.
F. K. Holland Company and
Eatherly Construction Co.
their suppliers and material
carriers
 "All other persons use south
entrance."
 
 The new sign at the south gate read:
 
 17
 "Notice
 "This entrance not to be used
 by Smith-Waller, F. K. Holland Co.
 and Eatherly Construction Co. or
 their suppliers. This entrance
 to be used only by
 H. E. Collins Contracting Company
Inc. and all subcontractors except
Smith-Waller Contracting Co. Inc.
F. K. Holland Company and
Eatherly Construction Co."
 
 
 18
 On October 23rd both pickets remained at the south gate as they had originally been ordered to do by the business agent of the Electrical Workers. On October 24th, however, one of them, Clyde Brown, went to the north gate when he saw workers going in that way. The second picket remained at the south gate from October 23rd to 31st. On October 31st the assistant business agent of the Electrical Workers directed both pickets to picket only the north gate, where they remained until November 13th when the picketing ceased.
 
 
 19
 From October 23rd until October 31st, the period during which the south gate was being picketed, the employees of union subcontractors refused to cross the picket line. When the picket at the south gate was removed to the north gate, all employees returned to work with the exception of the ironworkers, who refused to work until all picketing was discontinued.
 
 
 20
 On one of the first days of picketing, W. C. McDonald, steward for the Laborers and an employee of one of the union subcontractors, warned a group of laborers not to cross the picket line on pain of being fined or expelled from the union.
 
 
 21
 As has been noted, access to the job site by vehicular traffic was possible at both gates and at a service station. While the one picket was at the south gate, he was actually standing by the service station which was quite close. From October 23rd to 31st, during which time the alleged unfair labor practices occurred, the pickets were able to see the only points at which vehicular traffic could enter the job site.[4] As was also noted, it was possible to enter the job site on foot along the 900-foot front (east side); however, this was an inconvenient access.
 
 
 22
 No one testified that they had seen anyone enter the job site by other than the correct, designated gate during the relevant period. Clyde Brown, the picket at the north gate, testified that on October 26th or 27th the north gate was impassable because of rain, yet he saw cars of employees on the job site. Both pickets' testimony is weakened by the fact that they did not arrive at the job site until seven o'clock, a. m., while the nonunion subcontractors' employees reported for work at six a. m. Both pickets also left before the employees went home for the night. At best, the pickets could only guess how the employees got onto the job site before the pickets arrived.
 
 
 23
 The picture which develops is that while it was possible to enter the job site either on foot or at an improper gate, there is no direct evidence that anyone actually did so during the relevant period.
 
 
 24
 Based on these facts, the trial examiner found that the Laborers, through the actions of its steward, McDonald, had violated the Act. However, he also reasoned that there was no proof that the nonunion employees restricted themselves to use of the north gate reserved for them. Although they may not have used the south gate, it is of course possible that they may have walked onto the site somewhere in the 900-foot front (east side), or they may have come through the service station. At least on one occasion the nonunion employees managed to get their cars onto the job site when the north gate was impassable because of rain. The trial examiner stated:
 
 
 25
 "The burden of proof of illegal object in the picketing always rests upon the General Counsel, and it requires affirmative and substantial evidence. Had there been a fence, or gates of one kind or another, this sort of maybe proof, or what could have happened, would serve much less to support the defense. In the circumstances of the physical layout here, the element of probability assumes a different hue." (App. at 14)
 
 
 26
 The trial examiner found the probability was that the nonunion employees did not confine themselves to use of the north gate; therefore, the placing of a picket at the service station was not an unfair labor practice.
 
 
 27
 "Examined in the light of the evidentiary standards set out in Moore Dry Dock, it is clear that this was the normal situs of the business of the primary employers, that the picketing was in haec verba addressed to S&W, and that it was limited to such times as its employees were engaged there. In the total circumstances it cannot be said that the picketing was not limited to places reasonably close to the primary situs, or that the posted signs effectively restricted the situs of the primary dispute to the north end of the property. Accordingly, I find that the picketing was not conducted in a manner from which a secondary objective is inferrable." (Trial Examiner's footnote omitted.) (App. at 15-16)
 
 
 28
 The Board agreed with the trial examiner's conclusion that Laborers was guilty of an unfair labor practice, but disagreed with his exoneration of the Council and the Electrical Workers.
 
 The Board said:
 
 29
 "* * * If the employees were entering the premises along the unfenced portion of the highway, as Respondents allege, this might well justify the picketing of these areas as well as the North gate. It would not, however, justify the picketing of the South gate where no employees of primary employers are alleged to have entered.
 
 
 30
 "The Board has long held that picketing must be conducted so as to minimize its impact on neutral employers insofar as this can be done without substantial impairment of the effectiveness of the picketing in reaching the employees of the primary employer. These are the dual congressional objectives which it is the Board's duty to balance. To allow picketing of the gate publicly reserved expressly for employees and suppliers of neutral employers would be to countenance a willful enmeshment of neutrals, in violation of Section 8(b) (4) (B) of the Act." (Footnotes omitted.) (App. at 24)
 
 
 31
 Section 8(b) (4) (i) and (ii) (B) of the Act reflect —
 
 
 32
 "the dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own." (NLRB v. Denver Bldg. & Constr. Trades Council, 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951)).
 
 
 33
 The Supreme Court also said in that case that subcontractors and general contractors on a construction job are still independent contractors with respect to each other. 341 U.S. at 689-690, 71 S.Ct. 943. This has been interpreted to mean that subcontractors are neutral with respect to the labor disputes of each other. NLRB v. Nashville Bldg. & Constr. Trades Council, 383 F.2d 562, 565 (6th Cir. 1967), accord, Markwell and Hartz v. NLRB, 387 F.2d 79 (5th Cir. 1967), cert. denied, 391 U.S. 914, 88 S.Ct. 1808, 20 L.Ed.2d 653.
 
 
 34
 Because we are compelled to accept the interpretation that the union contractor and union subcontractors in the present case were neutral with respect to the labor dispute between the Respondents and the three nonunion subcontractors, the only question which must be answered is whether the picketing was protected primary or prohibited secondary activity. The mere fact that signs had been posted restricting access to the job site at that point to secondary employees and their suppliers, did not automatically remove it from permissible common situs picketing.
 
 
 35
 Respondents urge that the correct test to determine whether picketing is primary or secondary is the "work related" test of Carrier (United Steelworkers of America, AFL-CIO v. NLRB, 376 U.S. 492, 84 S.Ct. 899, 11 L.Ed.2d 863 (1964)) and General Elec. (Local 761, I.U.E.W., AFL-CIO v. NLRB, 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961)). Although there is some logic to Respondents' argument, see Markwell and Hartz v. NLRB, supra, 387 F.2d at 84 (dissenting opinion of Judge Wisdom), we believe the law to be that subcontractors and contractors are, with respect to each others' labor disputes, neutral as we have explained above.
 
 
 36
 To determine the legitimacy of Respondents' activity, we must test it in the light of the Moore Dry Dock standards. Sailors' Union of the Pacific (Moore Dry Dock Co.), 92 NLRB 547 (1950). In that case the Board said:
 
 
 37
 "In the kind of situation that exists in this case, we believe that picketing * * * is primary if it meets the following conditions: (a) The picketing is strictly limited to times when the situs of the dispute is located on the secondary employer's premises; (b) at the time of the picketing the primary employer is engaged in its normal business at the situs; (c) the picketing is limited to places reasonably close to the location of the situs; and (d) the picketing discloses clearly that the dispute is with the primary employer."
 
 
 38
 These standards are not absolute criteria of whether picketing is violative of the Act. See General Electric, supra, 366 U.S. at 677-678, 81 S.Ct. 1285, and cases cited. The Moore Dry Dock criteria are merely probative of whether "an object" of picketing was to induce a secondary boycott. A union has a duty to exercise "its right to picket with restraint consistent with the right of neutral employers to remain uninvolved in the dispute." Retail Fruit & Vegetable Clerks Union, Local 1017 v. NLRB, 249 F.2d 591, 599 (9th Cir. 1957). Whether the union has complied with this duty can be determined only by viewing all of the circumstances of the case.
 
 
 39
 In the present case there is no question but that the union complied with three of the Moore Dry Dock criteria. The picketing occurred only when the primary employers had men on the job site. These employers were engaged in their normal activities while on the job site. The signs which the pickets carried showed very clearly with whom they had a dispute. The problem presented is whether the picketing was reasonably close to the situs when a picket was placed at the service station, from October 24th to 31st.
 
 
 40
 In reversing the trial examiner, the Board concluded that picketing at the service station was not reasonably close to the situs of the primary employers' activities. The Board relied on the fact that there was no positive evidence that anyone used other than the proper, reserved gate during any of the relevant period. This fact is some indication of the true object of the picketing so close to the neutral south gate. In addition to this, the Board ws influenced by attempts made by the Council to get Collins to cancel his contracts with the primary employers. Attempts by the unions to enter into any sort of agreement with the nonunion subcontractors were obviously half-hearted. All of these facts are substantial evidence that an object of the picketing was to induce employees of Collins to stop work in order to force Collins to stop doing business with the nonunion subcontractors.
 
 
 41
 This Court is required to affirm the decision of the Board if it is supported by substantial evidence on the record taken as a whole. The instant case is not without some doubt. However, taking the record as a whole, we believe that there is substantial evidence to support the decision of the Board.
 
 
 42
 Had there been any positive evidence that the employees did not confine themselves to the north gate for ingress and egress, we might have reached a different conclusion. The picket stationed 150 feet from the south gate, at the service station, does not seem unreasonably close to the neutral gate. It would be reasonable to picket if primary employees were using the service station as an entrance to the job site, but they were not.
 
 
 43
 Even the Board, in that portion of its decision quoted above, agreed that if employees were entering at some point other than the reserved gate, it would be permissible to picket at that point. However, with no evidence that the primary employees used other than the north gate, it is difficult to characterize picketing some 900 feet away as reasonable and consonant with a duty not to enmesh neutrals in a labor dispute. Considering this lack of evidence to support the reasonableness of the picketing in conjunction with activities of the Council prior to picketing, it appears on the record that the Board's conclusions are supported by substantial evidence.
 
 
 44
 We think that in view of the language of the Board's decision and order, it is necessary that we clarify the legal basis for finding a violation of the Act. The violation does not lie in the fact that picketing occurred near a gate reserved exclusively for use by employees of a neutral employer. The picketing constituted a violation of the Act because substantial evidence on the record taken as a whole reveals that there was no attempt to avoid enmeshing neutrals in this dispute; and, in fact, an object of the picketing was specifically to enmesh these neutrals, i. e., to cause a secondary boycott.
 
 
 45
 The Electrical Workers and the Council, as a result of picketing at the service station, were guilty of an unfair labor practice proscribed by Section 8(b) (4) (i) and (ii) (B) of the Act.
 
 
 46
 The Laborers, through the actions of its steward, McDonald, in actually threatening neutral employees with job loss or fines if they crossed the picket line, clearly violated Section 8(b) (4) (i) (B) of the Act.
 
 
 47
 We do not believe that the order of the Board is too broad. Violations similar to that in the instant case have been found to have been committed by Respondent Council in the past. NLRB v. Nashville Bldg. & Constr. Trades Council, 383 F.2d 562 (6th Cir. 1967). Such past violations warrant a broader order. NLRB v. Teamsters, Chauffeurs, etc., Local Union 327, 419 F.2d 1282 (6th Cir. 1970).
 
 
 48
 The order of the Board is enforced.
 
 APPENDIX
 
 49
 NOTE: OPINION CONTAINING TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 
 Notes:
 
 
 [1]
 The Board stated that the Council had given Jolley the requested assurances. (App. at 20). Actually, union business agents who stated that they constituted a majority of the members of Council did give assurances to Jolley, but no formal action was ever taken by the Council, which later did not comply with the agreement
 
 
 [2]
 Some subcontractors were already on the job as of the time that this meeting occurred. App. at 54
 
 
 [3]
 See sketch appended hereto
 
 
 [4]
 The trial examiner believed that evidence of disregard of the gates after October 31st,i. e., between November 1st and 7th, was relevant in that it mirrored what probably occurred prior to that time. We do not agree that such evidence was relevant. However, during that entire period, picketing was restricted to the north gate. There is no contention that this was an unfair labor practice.