497 F.2d 60
 86 L.R.R.M. (BNA) 2755, 74 Lab.Cas. P 10,098
 LOCAL 98, UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES
OF the PLUMBING AND PIPE FITTING INDUSTRY OF the
UNITED STATES AND CANADA, AFL-CIO and
Larry Delehant, Respondents-Appellants,
v.
NATIONAL LABOR RELATIONS BOARD, Petitioner-Appellee.
 Nos. 71-1413 and 72-1044.
 United States Court of Appeals, Sixth Circuit.
 Argued April 4, 1974.
Decided June 6, 1974.
 
 Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Paul Elkind, Chief, Contempt Litigation, Peter Ames Eveleth, Associate Chief, Contempt Litigation, Charles Donnelly, Atty., National Labor Relations Board, Washington, D.C., on brief, for petitioner-appellee.
 Boaz Siegel, Detroit, Mich., on brief, for respondents-appellants.
 Before PHILLIPS, Chief Judge, and PECK and MILLER, Circuit Judges.
 PHILLIPS, Chief Judge.
 
 
 1
 This is a civil contempt proceeding filed by the National Labor Relations Board against Local 98, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO (the Union) and its agent, Business Representative Larry Delehant.
 
 
 2
 On May 27, 1971, and January 25, 1972, this court entered consent judgments enforcing unreported Board orders against the Union, in Board cases Nos. 7-CC-605(4) and 7-CC-646, respectively. The orders of the Board which were enforced by the consent judgments of this court each require the Union, its officers, agents and representatives, to cease and desist from:
 
 
 3
 (a) Engaging in, or inducing or encouraging any individual employed by . . . any . . . person engaged in commerce or in an industry affecting commerce, to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport or otherwise handle or work on any goods, articles, materials or commodities or to perform any service, or
 
 
 4
 (b) threatening, coercing or restraining . . . any . . . person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is to force or require . . . any . . . person, to cease using, selling, handling, transporting, or otherwise dealing in the products of or to cease doing business with Certified Contractors Corporation.
 
 
 5
 Thereafter the Board filed a petition in this court for adjudication in civil contempt and for other civil relief charging that the respondent Union had disobeyed and failed and refused to comply with the consent judgments of this court. This court entered a show cause order against respondents. The union filed its answer denying that it was in contempt of this court or that it had disobeyed said judgments of enforcement. This court thereupon entered an order of reference appointing Honorable Thomas P. Thornton, Senior Judge, United States District Court for the Eastern District of Michigan, as Special Master to hear evidence and report to this court as to whether respondents are in civil contempt for violating, disobeying and failing and refusing to comply with the judgments.
 
 
 6
 After hearing evidence which is preserved in a transcript of more than 400 pages, the Special Master adopted findings of fact and conclusions of law, holding that respondents are in civil contempt of the aforesaid judgments of this court, because of the Union's picketing and other acts by which respondents induced and encouraged employees to engage in strikes and work stoppages at several construction sites with the object of forcing or requiring neutral employees to cease doing business with Certified Contractors Corporation (Certified).
 
 
 7
 The findings of fact of the Special Master are summarized as follows:
 
 
 8
 Certified is a Michigan corporation engaged as a plumbing and heating contractor in and around Detroit, Michigan. Certified's journeymen and apprentice plumbers were at all material times represented under a collective-bargaining contract between Certified and Local 124 of the United Construction and Trades Union International.
 
 A. The Red Cross Jobsite
 
 9
 In late April 1972,[1] Certified began plumbing work for Campbell Construction Company (Campbell) at the Detroit Red Cross Building, under the supervision of Master Plumber Joseph Grates. On May 8, approximately 25 craftsmen and general laborers employed by eight subcontractors, including Certified, were scheduled to work at the site. On that morning however, the Union picketed the Red Cross jobsite with signs protesting Certified's failure to pay Union wages and benefits. The pickets marched on sidewalks on three sides of the jobsite (the fourth side, a small alleyway, was not picketed). In the course of the picketing, the pickets patrolled in front of the main employee entrance to the jobsite. As a result, employees of all the various subcontractors engaged in performing work on the jobsite, with the exception of Certified and Guardian Electric, refused to work and left the site. The picketing continued in the same manner on May 9 and only Certified and Guardian Electric continued to work in face of the picketing.
 
 
 10
 On May 10, Certified established an entrance exclusively for use of its own employees and suppliers which was located in an alley bounding one side of the jobsite. At this location, Certified erected a sign designating the entrance as reserved for its sole use and that of its suppliers. In addition, at the main employee entrance, which was being picketed, a sign (Gate 1) was erected which forbade use of that entrance by Certified's employees and suppliers and restricted its use to employees and suppliers of neutral contractors. After the reserved gates were erected, no employee or supplier of Certified used any entrance other than Gate 2. Despite the fact that Certified was thus excluded from use of the main entrance, the Union continued to picket that gate and did not picket Certified's alley entrance. On May 10, only Certified and Guardian Electric employees worked, while on the following day, Guardian Electric ceased to work. The Union's picketing persisted until May 15, with the pickets continuing to station themselves at the main entrance. As a result of the picketing, Campbell, the general contractor, cancelled Certified's plumbing subcontract; thereafter the Union discontinued its picketing of the jobsite.
 
 B. The Cyril Burke Jobsite
 
 11
 Certified was also the plumbing subcontractor on a construction project in Sterling Heights, Michigan in the Detroit area for the Cyril Burke Rental Equipment Company. In early June, Certified's employees completed installation of underground plumbing. On June 5, under the supervision of Master Plumber Harold Doubles, Certified's employees collected their tools, equipment and vehicles with the exception of a company trailer (which they padlocked) and departed from the jobsite, intending to return only after the electrical subcontractor (Starlite Electric) and other subcontractors had performed work preliminary to further plumbing installation.
 
 
 12
 On the morning of June 6, five or more Union pickets appeared at the Burke site with signs identical to those used at Red Cross and proceeded to picket the three employee entrances despite the fact that Certified was not working at the site. The picketing was at all times conducted under the direction of Business Agent Larry Delehant. Shortly after the picketing began, Starlite Electric's foreman, Kenneth Walters, arrived at the site to work on scheduled electrical installation and was confronted by Delehant. Delehant announced that the Union was picketing Certified and instructed Walters to contact his own business agent for advice about working while the site was being picketed. As a result of the picketing and Delehant's instructions to Walters, Starlite Electric did not work at the Burke site on June 6, although it was scheduled to lay floor conduit that day.
 
 
 13
 At noon on June 6, Delehant also approached a carpenter, Clifford Kniffen, who was working at Burke for C.D. Lewis Construction Company (Lewis), the general contractor at the site. Delehant asked Kniffen to call the Carpenters Union business agent, but Kniffen refused. Later, a Carpenters Union business agent, after speaking with the Union pickets at the jobsite, spoke to Kniffen and warned him that he 'could be fined' for working behind the picket line. As a result of the foregoing, Kniffen refused to work at the Burke site.
 
 
 14
 The Union continued to picket the Burke site for several days after June 6, despite the fact that on June 7, Delehant learned that Certified had by telegram notified the Union that they had ceased working at the site on June 5 and would not return for several weeks. As already indicated, Certified could not work because Starlite had not completed its electrical work. On June 8, Starlite foreman Walters again attempted to work at the Burke site. However, Union pickets stated that the Union would 'appreciate it' if Walters refused to work in response to the picketing.[2] As a result of the foregoing, he again refused to work at the site.
 
 
 15
 Later on the same day, Certified roped off the site and, with appropriately worded signs, established a gate reserved exclusively for the use of its own employees and suppliers (Gate 2). In addition, at the main employee entrance it erected a sign prohibiting use of the entrance by its own employees and reserving it for use by neutral employees and suppliers (Gate 1). Even after these entrances had been created, however, three or more Union pickets congregated at the main entrance set aside for use by neutrals. Picketing at the main entrance continued for several days after the reserved entrances had been established, although Certified was not working at the site. Further, employees of subcontractors who came to the site to work refused to do so because of the Union's picketing.
 
 
 16
 The Union resumed picketing the Burke site on Monday morning, June 12. Delehant made an inquiry of the general contractor's superintendent about the identity of the replacement for Certified as plumbing contractor. Apparently satisfied that Certified would not be returning, the pickets then left the site. Later in the day, the Starlite crew and other subcontractors returned to the site and resumed working.
 
 C. The Detroit Bank and Trust Jobsite
 
 17
 Similarly, in October 1972, Certified was engaged as mechanical subcontractor in the construction of a suburban branch of the Detroit Bank and Trust. After completing the underground plumbing work on October 20, Doubles and his crew ceased working and removed the tools, materials and vehicles from the site and departed, as they could proceed no further until the concrete floor had been poured. Certified intended to return no sooner than late November.
 
 
 18
 On Monday, October 23, the Union picketed the site with signs protesting Certified's failure to pay Union wages and fringes. In the course of the picketing, a picket stationed himself at the main employee entrance to the jobsite. As a result, employees of at least one subcontractor on the job refused to perform any work at the site. As noted, as Certified had no work scheduled, it was not present at the site on that date. Picketing continued on October 24 and 25 at the main entrance, and as a result, necessary and scheduled electrical work was not performed. On the morning of October 25, Certified established 'reserved gates' at the site, as at Red Cross and Burke. Certified employees and suppliers were thereby restricted to an entrance (Gate 2) separate and apart from the main employee entrance (Gate 1). However, the Union continued to picket the main entrance reserved for neutrals. Sometime later that day, the Union confined its picketing to Certified's entrance and ceased picketing the neutral entrance.
 
 
 19
 On account of the above-described conduct, the Master concluded that the Union and Delehant disobeyed the judgments of this Court of May 27, 1971 and January 25, 1972, in that the Union and its agents induced and encouraged individuals employed by persons engaged in commerce or in an industry affecting commerce to engage in strikes or refusal to use, manufacture, process, transport or otherwise handle or work on any goods or to perform services, and threatened, coerced and restrained said persons, where in both cases, and object thereof was to force or require such persons to cease doing business with Certified. The Master further stated that the Union 'has demonstrated a proclivity to engage in unlawful secondary activity in furtherance of its labor disputes with various primary employers in addition to Certified.'
 
 
 20
 He concluded as a matter of purgation that 'a broad cease and desist order is necessary in order to prevent future unlawful secondary conduct toward neutral employers.' Accordingly, he recommended that an order issue enjoining Delehant and the Union from exerting unlawful secondary pressure against Certified 'or any other person.' In addition, he recommended that respondents be required to post and mail appropriate notices and to pay the Board's costs and expenses. Finally, to assure a cessation of violations of the court's decree, he recommended that the court assess a prospective fine, in an amount to be fixed by the Court, for each and every further violation.
 
 
 21
 The standard of proof in this civil contempt action is whether the Board has shown by clear and convincing evidence that the respondents have engaged in contumacious conduct. N.L.R.B. v. Local 5881, United Mine Workers of America, 323 F.2d 853, 854 (6th Cir. 1963). Clear and convincing evidence on the record as a whole supports the findings of the Special Master in the present case that respondents, by picketing and by direct oral inducements deliberately sought to enmesh neutral employees in the primary dispute between respondents and Certified. We hold that the Master's finding of conduct constituting civil contempt is supported more than amply by clear and convincing evidence.
 
 
 22
 Section 8(b)(4) of the National Labor Relations Act, embodied in the judgments of this court, provides that it shall be an unfair labor practice for a labor organization or its agents:
 
 
 23
 '. . . to engage in, or to induce or encourage any individual employed by any person engaged in commerce or an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, or articles, materials, or commodities or to perform any services; or . . . to threaten, coerce, or restrain any person engaged in commerce or an industry affecting commerce;
 
 
 24
 where in either case, an object thereof is:
 
 
 25
 'forcing or requiring any person to cease using, selling handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person . . ..'
 
 
 26
 These provisions reflect the 'dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own,' N.L.R.B. v. Denver Building and Construction Trades Council, 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951). See also, N.L.R.B. v. Nashville Building and Construction Trades Council, 425 F.2d 385, 391 (6th Cir. 1970). Thus, in this case, the Union was entitled to bring pressure to bear directly upon Certified in connection with its primary dispute. However, as this Court has recognized, subcontractors are neutral with respect to the labor disputes of each other. N.L.R.B. v. Nashville Building and Construction Trades Council,supra, 425 F.2d at 390. They are, therefore, entitled to the protection of the Act's secondary boycott provisions. Accord: N.L.R.B. v. Denver Building and Construction Trades Council, supra, 341 U.S. at 690; N.L.R.B. v. Nashville Building and Construction Trades Council, 383 F.2d 562, 564-566 (6th Cir. 1967). Since the Union here had no dispute at any of the jobsites involved in this proceeding with any of the general contractors or subcontractors, except Certified, these neutral employers were entitled to be free of economic pressure from the Union on account of its dispute with Certified. Accordingly, to the extent possible, the Union and Delehant were under a duty to relieve the secondary effects of picketing at the 'common situs' construction projects here involved. This court has recognized that a failure to minimize effects is strong evidence that 'an object' of the picketing is one proscribed by the statute. See N.L.R.B. v. Nashville Building and Construction Trades Council, supra, 425 F.2d at 392.
 
 
 27
 Respondents contend that they should not be adjudged in contempt because of their primary labor dispute after this court entered the order of reference to the Special Master in this proceeding. The settlement of this dispute did not occur until the eve of the contempt hearing before the Master, long after the respondents had resorted to the conduct which the Master found to be contumacious. Assuming that the Union now has made peace with Certified, this does not foreclose the prospect that it may resort to the same objectionable conduct in the future if it wishes to bring pressure to bear on neutral subcontractors in another dispute. In an analogous situation in N.L.R.B. v. Local 825, IUOE, 430 F.2d 1225, 1227 (3rd Cir. 1970), cert. denied, 401 U.S. 976, 91 S.Ct. 1200, 28 L.Ed.2d 326 (1971), the court said:
 
 
 28
 'If such repeated violations of particular prohibitory decrees of this court have occurred, a civil proceeding is appropriate to determine whether the misconduct amounted to contempt and, if so, what civil sanctions are appropriate and reasonably calculated to cause the union to abandon a course of intermittent flouting of our decrees whenever such misconduct may seem to serve its purposes.'
 
 
 29
 To the same effect, see N.L.R.B. v. Heck's Inc., 369 F.2d 370, 371 (6th Cir. 1966); N.L.R.B. v. Robinson, 251 F.2d 639, 642 (6th Cir. 1958); N.L.R.B. v. United Mine Workers of America, District 23, 195 F.2d 961, 963 (6th Cir. 1952), cert. denied, 344 U.S. 920, 73 S.Ct. 387, 97 L.Ed. 709 (1953), and N.L.R.B. v. Prettyman, 117 F.2d 786, 792 (6th Cir. 1941).
 
 
 30
 Upon consideration of the briefs and oral arguments of the parties and the entire record, including the transcript of the evidence before the Special Master, this court concludes that the findings of fact of the Special Master are supported by clear and convincing evidence and should be approved and confirmed in all respects.
 
 The following order will be entered:
 
 31
 The National Labor Relations Board having filed a petition to adjudge in civil contempt Local 98, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO and its agent, Larry Delehant, in that respondents have failed and refused to comply with the judgments of this court entered on May 27, 1971, and January 25, 1972; and Senior United States District Judge Thomas P. Thornton in his capacity as Special Master having made a report recommending that respondents be adjudged in civil contempt of this court and be required to purge themselves thereof:
 
 
 32
 It is ordered that the findings of fact and conclusions of the Special Master be approved and confirmed in all respects.
 
 
 33
 It is further ordered that Local 98 and its agent, Larry Delehant, are hereby adjudged in civil contempt of this court for violating and disobeying the aforesaid judgments.
 
 
 34
 It is further ordered that the respondent Union and its officers, representatives, agents, successors and assigns, including respondent Larry Delehant, shall purge themselves of such contempt by:
 
 
 35
 (a) Complying fully with and obeying the Board's orders as enforced by this court's consent judgments of May 27, 1971, and January 25, 1972.
 
 
 36
 (b) Ceasing and desisting from engaging in, or inducing or encouraging any individual employed by any person engaged in commerce or in an industry affecting commerce, to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any service; or in any manner or by any means, threatening, coercing or restraining any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is to force or require any person to cease using, selling, handling, transporting, or otherwise dealing in the products of or to cease doing business with Certified Contractors Corporation or any other person.
 
 
 37
 (c) Immediately posting in conspicuous places in business offices, meeting halls, and all places where notices to members are customarily posted, for a period of 60 days, copies of a notice in the form prepared by the Board, signed by an appropriate officer on behalf of the Union and by Larry Delehant which states that the Union and Delehant have been adjudicated in civil contempt of this Court for violating and disobeying the Court's judgments of May 27, 1971, and January 25, 1972, and that they will forthwith undertake appropriate action in purgation, such notices and a copy of the contempt adjudication to be maintained in clearly legible condition throughout such posting period and insuring that such notices are not altered, defaced, or covered by any other material.
 
 
 38
 (d) Signing and mailing sufficient copies of said notice to the Regional Director for the Seventh Region of the National Labor Relations Board, 500 Book Building, 1249 Washington Boulevard, Detroit, Michigan 48226, for posting at the offices of the secondary employers named in the petition should such secondary employers be willing.
 
 
 39
 (e) Signing and mailing copies of said notice and the adjudication to all employers in the construction industry with whom the Union has a signed agreement; and signing and mailing copies of the notice and adjudication to all members of the Union; and reading said notice by an officer of the Union at a special meeting called for said purpose, on reasonable notice.
 
 
 40
 (f) Filing separate sworn statements with the aforesaid Regional Director in writing within ten days after the order of adjudication and again upon termination of the posting period, showing what steps have been taken by the Union and the individual respondent to comply with the court's direction.
 
 
 41
 (g) Paying to the Board all costs and expenses incurred in the investigation, preparation and final disposition of this proceeding for an adjudication in civil contempt, but not including counsel fees.
 
 
 42
 In order to insure compliance with the foregoing provisions, it is further ordered that upon the failure of the respondents to purge themselves of contempt as herein provided, this court shall impose a compliance fine of $1,000 on the respondent Union and a further compliance fine of $100 per day so long as such noncompliance continues. The court will deal further with the matter by such other means as the court shall then determine, including the issuance of a body attachment upon any officer, representative or agent responsible for such noncompliance. See N.L.R.B. v. Local Union No. 80 Sheet Metal Workers' International Association, AFL-CIO, 491 F.2d 1017 (6th Cir. 1974).
 
 
 
 [1]
 Unless otherwise indicated, all dates hereafter refer to 1972
 
 
 [2]
 The pickets revealed to Walters that their dispute was with Local 124 with whom Certified had a labor agreement and that 'we're out to stop them'